### UNITED STATES of America, Plaintiff-Appellee,

v.

Gerald Richard JOHNS, Howard Seavey Webb, Mahlon W. Burchell, Joseph Ralph Stewart, Charles Randall Stewart, Thomas Aaron Smith, Arthur Dee Riley, William Eugene Massey, James Henry Bettis and Will Roger Reynolds, Defendants-Appellants.

### No. 79–5336
### Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

April 17, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

George Allen Parker, Tarrant, Ala. (court-appointed), for Johns.

Arthur J. Hanes, Birmingham, Ala., for Webb.

J. Louis Wilkinson, Birmingham, Ala., for Burchell, Webb, Bettis, Stewart, Stewart, Massey, Smith & Riley.

J. R. Brooks, U. S. Atty., Henry I. Frohsin, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before CHARLES CLARK, VANCE and SAM D. JOHNSON, Circuit Judges.

PER CURIAM:

Gerald Richard Johns, Howard Seavey Webb, Mahlon W. Burchell, Joseph Ralph Stewart, Charles Randall Stewart, Thomas Aaron Smith, Arthur Dee Riley, William Eugene Massey, James Henry Bettis and Will Roger Reynolds are members or associates of the Ku Klux Klan. They were indicted and convicted on various criminal charges stemming from their attempts to interfere with the civil rights of whites and blacks in Sylacauga and Childersburg, Alabama. Their appeal challenges both the district court decision overruling their motions for mistrial and the sufficiency of the evidence to support their convictions. We affirm.

I

The appellants' Klan chapter was concerned with the dating, social and living habits of bi-racial couples in Sylacauga, Alabama. On November 24, 1978, Randy Charles Ward, Joseph Stewart, Reynolds, Webb and Bettis were appointed to a committee on the matter. They met that evening and formulated a plan to shoot into the Huntley residence, a home occupied by two black men and two white women. Stewart gave Ward a shotgun. Leaving the Klan hall, these men proceeded in three cars to the Huntley residence. Webb, armed with a rifle, drove with Reynolds, acting as a backup to fend off intruders or pursuers. Bettis parked two blocks away, waiting to receive the shotgun from Ward in order to conceal it. Ward, in a car driven by Stewart, fired into the front of the house.

On November 30, a second committee, consisting of Ward, Burchell, Charles and Joseph Stewart, Johns, Rickey Maness, Massey, Fred Holmes, Jr., Bettis, Smith and Riley, met and formulated a plan to intimidate Willie James Williams and Charles Woods, respectively, presidents of the Sylacauga and Childersburg chapters of the NAACP. The committee's goal was to curb NAACP efforts to instigate affirmative action programs for black employment within the Sylacauga and Childersburg city governments.

According to their plan, the men divided into two teams. One team went to Woods' residence in Childersburg. Smith and Riley waited for the shotgun while Holmes and Massey acted as backup. Burchell drove Ward, who fired five shots into the home. The second team proceeded to Williams' home. Bettis drove Charles Stewart and Maness, both armed with shotguns. Johns and Joseph Stewart rode in another car. Charles Stewart fired a single blast into Williams' home. Maness fired four shots, striking both the home and Williams' automobile.

Following these three incidents, the appellants were indicted. After a jury trial, Bettis, Burchell, Smith, Massey, Charles and Joseph Stewart, Johns and Riley were convicted for intimidating and interfering with persons exercising a federally protected activity, 18 U.S.C. §§ 2, 245(b)(5), and for conspiring to do the same, 18 U.S.C. §§ 371, 245(b)(5), (counts three through five). Webb, Reynolds and Joseph Stewart were also convicted of conspiring to violate the Fair Housing Act, 18 U.S.C. § 371, 42 U.S.C. § 3631, and, along with Bettis, for violating the same, 18 U.S.C. §§ 2 or 3, 42 U.S.C. § 3631, (counts six through eight).[1]

---

1. The jury acquitted Bettis, Webb, Burchell, Charles Stewart, Joseph Stewart and Johns on conspiracy and substantive counts charging them with the unlawful impersonation of an FBI agent, 18 U.S.C. §§ 2, 371, 913. Burchell was also acquitted on count six, charging a conspiracy to violate the Fair Housing Act.

*Sufficiency of the Evidence*

Appellants challenge the sufficiency of the evidence to sustain their convictions under either 42 U.S.C. § 3631 (counts six, seven and eight) or 18 U.S.C. § 245(b)(5) (counts three, four and five). They assert that neither statute reaches, and criminally sanctions, the sort of activity in which they were engaged. They argue, further, that even if their activity was proscribed, they lacked the intent necessary to sustain a conviction under these statutes.

These arguments are without merit. Viewed in the light most favorable to the government and the jury verdict, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the prosecution produced substantial evidence sufficient to sustain the convictions on counts three through eight. *See, e. g., United States v. Aguiar,* 610 F.2d 1296, 1305 (5th Cir. 1980); *United States v. Villareal,* 565 F.2d 932, 937–38 (5th Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

The legislative history accompanying 42 U.S.C. § 3631 and 18 U.S.C. § 245(b) indicates a clear congressional intent to impose criminal sanctions on persons who engage in the conduct appellants were found to have participated in and with the intent appellants were found to have had. S.Rep. No. 721, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 1837, 1838–39, 1843, 1845.

■ Title IX of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. § 3631, provides in pertinent part:

Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race . . . and because he is or has been . . . occupying . . . any dwelling . . .

. . . . .

shall be fined not more than $1,000, or imprisoned not more than one year, or both . . . .

This provision protects one's right to occupy a home regardless of race. *Cf. United States v. Ellis,* 595 F.2d 154, 158 n. 3 (3rd Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979) (section 3631 reaches firebombing of Spanish-surnamed family's home); *United States v. Anzalone,* 555 F.2d 317, 318 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978) (section 3631 reaches acts of vandalism and arson designed to intimidate blacks from moving into a neighborhood; conviction reversed on other grounds). The evidence supports the jury's finding that the defendants shot into the Huntley residence to discourage both interracial living arrangements and interracial dating. The presence of other motives, given the existence of the defendants' motive to end interracial cohabitation, does not make their conduct any less a violation of 42 U.S.C. § 3631. Under the circumstances of this case, the jury could well find that defendants intended by their conduct to interfere with the exercise of the rights of the attacked individuals and others to live where they wish regardless of their race or color.

■ Title I of the Civil Rights Act of 1968, 18 U.S.C. § 245(b)(5), in pertinent part, provides:

Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

. . . . .

(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate [in such public assistance programs as seeking or enjoying employment, or partaking of benefits, services, privileges, programs, facilities or activities provided by the United States], without discrimination on account of race, color . . .

shall be fined not more than $1,000, or imprisoned not more than one year, or both . . . .

The evidence adduced at trial demonstrates that in attacking the NAACP leaders the defendants intended forcibly to discourage the NAACP's efforts to secure better employment and housing opportunities for blacks and its efforts to ensure appropriate distribution of government revenues to the beneficiaries of various programs. *See, e. g., United States v. Griffin,* 525 F.2d 710, 712 (1st Cir. 1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976). Title 18 U.S.C. § 245(b)(5) clearly warrants prosecuting individuals who attempt to interfere with such efforts. *See Johnson v. Mississippi,* 421 U.S. 213, 224–26, 95 S.Ct. 1591, 1597–1598 (1975); *Williams v. Tri-County Community Center,* 452 F.2d 221, 223 & n. 3 (5th Cir. 1971). *See also United States v. Price,* 464 F.2d 1217, 1218 (8th Cir.), *cert. denied,* 409 U.S. 1040, 93 S.Ct. 522, 34 L.Ed.2d 489 (1972); *Hill v. Pennsylvania,* 439 F.2d 1016, 1021–22 (3rd Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 445, 30 L.Ed.2d 370 (1971).

*Motion for a Mistrial.*

■ Appellants' mistrial argument rests on their assertion that prejudicial information had reached the sequestered jury. They argue that the district court committed reversible error in overruling their motions for mistrial following receipt of information that an alternate juror had learned that a witness had been killed. The district court, after conducting a full hearing on the matter, properly exercised its discretion in overruling appellants' mistrial motion. *United States v. Khoury,* 539 F.2d 441, 443 (5th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *Tillman v. United States,* 406 F.2d 930, 937 (5th Cir.), *vacated in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

On June 12, 1979, the trial court informed all counsel that it had received a report from the U. S. Marshal that one of the alternate jurors had inquired about a witness' death. The two alternate jurors had been dismissed on the previous day when the jury began its deliberations. The district judge immediately held a full hearing to determine what the alternates knew and what, if anything, they had conveyed to other members of the jury. Alternate juror Hicks testified that his wife had said that a witness had been killed and that he mentioned this to alternate juror Rose and to jury foreman Davis. Rose's testimony confirmed that she had heard of the killing. Neither juror could identify the witness with the prosecution or the defense. Both testified that they had not been intimidated or affected by the information. At the conclusion of the hearing, each defendant moved for a mistrial. The court overruled these motions and entered findings concerning the absence of prejudice.

On June 14, 1979, the jury returned its verdict convicting the appellants under counts three through eight. It acquitted them on two other counts. Note 1 *supra.* The court then questioned each juror, under oath and out of the presence of other jurors, concerning his or her knowledge of the information related to Hicks. No juror, except the foreman, Davis, had such knowledge. Like Hicks and Rose, Davis had no other information. He further testified that he had not ascribed any significance to the information or linked the information to trial. The court concluded that the information was innocuous and without prejudice to the defendants beyond a reasonable doubt.

■ The court's actions in investigating the claims on which the mistrial motion was based accorded with its "ever-present duty to ascertain whether a jury has been affected by events occurring outside of the trial." *United States v. Martinez,* 604 F.2d 361, 364–65 (5th Cir. 1979). The trial court's procedure of separately questioning the alternate jurors and then, later, the serving jurors, accorded with that approved in *Martinez* and in *Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). The trial court's conclusions were not clearly erroneous.

AFFIRMED.