**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mailon Paul WOOD, Kenneth E. Davis, William L. Deering and Winford "Billy" Wood, Defendants-Appellants.**

No. 85–8006.

United States Court of Appeals, Eleventh Circuit.

Jan. 22, 1986.

---

Frank P. Samford, III (Court-appointed), Decatur, Ga., for Mailon Wood.

Thomas E. Spraley (Court-appointed), Atlanta, Ga., for K. Davis.

Tony H. Hight (Court-appointed), Fairburn, Ga., for Deering.

Stephanie Kearns, Federal Defender Program, Inc., Atlanta, Ga., for W. Wood.

Stephen Cowen, Asst. U.S. Atty., Atlanta, Ga., Marie E. Klimesz, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiff-appellee.

Before TJOFLAT and KRAVITCH, Circuit Judges, and DUMBAULD *, District Judge.

TJOFLAT, Circuit Judge:

## I.

### A.

This criminal case arises from two incidents of racially motivated violence. On November 23, 1982, appellants Mailon Paul Wood, Kenneth E. Davis, and William L. Deering, along with Lyndon Terrell, all of whom were members of a Ku Klux Klan Klavern in Haralson County, Georgia, decided to "serenade" a white woman whom they felt associated too often with members of the black community. That evening, the four men drove to the residence of Mrs. Peggy Jo French, who lived with her two children, Lori and Michael Roper, ages fifteen and nineteen, in Waco, Georgia. (Her husband, having been sentenced to prison for a crime not pertinent to this case, was not living with the family.)

The men, all masked with the exception of Mailon Wood, burst into the French residence with guns. They told Mrs. French that they were looking for "niggers" and guns and that if they found any it was "going to be bad." They began emptying drawers and kicked in a wall between two rooms. One of the masked men grabbed Mrs. French and said that he knew she was a "nigger lover." Another man, later identified as Deering, then threw her across a coffee table and beat her with a leather strap eight to ten times across her back, arms, buttocks, and the back of her legs.

* Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

Prior to the beating, Wood went into Lori Roper's bedroom with a gun and brought her out into the living room where she witnessed the attack on her mother. Wood then took Lori back into her bedroom and asked her if she or her mother or brother had been sleeping with any "niggers." After approximately five minutes, he returned with Lori to the living room and forced her to sit in a chair.

Michael Roper, having seen the lights of the assailants' car as it pulled into the driveway, was walking down the hall from his bedroom when he heard a commotion in the living room. When he got to the end of the hall he was told by a masked man with a gun to stop right there or the man would "blow [his] head off." Michael then witnessed Deering beating his mother with a strap. Michael was forced to sit on the couch with his head between his knees. Deering then hit him with the strap and told him that he better not be using drugs or hanging around with any blacks.

Wood then stated that he was particularly concerned with Lori Roper's upbringing and threatened that, if the family did not straighten out, he would come back and take Lori with him. Prior to leaving, Wood reiterated that nobody in the family should continue to associate with "niggers." He warned Mrs. French that he and his friends would have people watching her house and that, if they ever caught her with black people there, he and his friends would come back and tar and feather her. Just before the four men left, they told Mrs. French and her two children to keep their heads down for a long time. When Michael Roper raised his head before the men left he was told that, if he did that again, his head would be blown off. As they were leaving, the men promised to return if they learned of the presence of any more "niggers" in the French residence.

When the men had left, Mrs. French and her children went outside to drive to the police station, but the tires on her car had been slashed. She was unable to call the police because her telephone lines had been cut. After replacing the slashed tires, she drove to the police station and reported the incident.

Several months later, Mrs. French and Lori Roper saw a news segment on television of a Ku Klux Klan rally and recognized one of the men participating in the rally as the unmasked man who was a member of the group that had terrorized their family on the night of November 23. Mrs. French contacted the Federal Bureau of Investigation (FBI) which obtained a copy of the videotape and replayed it before her and her children. As a result, the FBI was able to identify the unmasked man as appellant Mailon Wood.

On February 9, 1983, prior to Mrs. French's identification of Wood, the second incident involving racially motivated violence occurred at the residence of Warren and Peggy Cokley. Deering told Terrell and Wood, at the conclusion of another Klavern meeting,[1] that there was a white woman (Peggy Cokley) in Tallapoosa, Georgia, living with a black man (Warren Cokley) and that they needed to pay them a visit. They decided that they "would get together on that later on sometime." Approximately two weeks later, Terrell telephoned either Deering or Wood to determine when they would deal with the Cokleys. They settled on a date to meet at Deering's house. On that day, Terrell induced a fellow Klavern member, Kent Adams, to take him to Deering's house by telling him they were going rabbit hunting. When they arrived, they found Deering, Mailon Wood, and his brother and fellow Klavern member, appellant Winford "Billy" Wood, present. Davis arrived soon after. Terrell asked Adams if he wanted to "go scare somebody," to which Adams indicated that he would participate, and the six men rode in Davis' van to the Cokley residence. On the way, they decided that Ter-

---

1. Lyndon Terrell, the Exalted Cyclops of the Ku Klux Klan Klavern in Haralson County, Georgia, testified at appellants' trial that meetings of the Klavern were held every two weeks at Mailon Wood's home.

rell and Deering would go in the front door and that the others would go in the back.

When they reached the Cokleys' home, all of the men except Davis got out of the van and approached the house. Terrell and Adams put on face masks which Terrell had made sometime earlier. Mailon and Billy Wood and Deering put stockings over their heads. Mailon tried to cut the Cokleys' telephone line but expressed little concern when he failed because he and his accomplices had ensured that the police would not be available to interfere with their activity that evening.[2]

As planned, Terrell and Deering entered the front door. Warren Cokley saw Deering, whom he knew,[3] enter with a gun pointed at him and asked him what he was doing. Deering responded, "you think your a smart ass nigger," and the two began to scuffle. By this time the three men at the back door entered. As they did so, Peggy Cokley ran out the front door to the home of Warren Cokley's mother, Georgia Wise, who lived next door. Mailon Wood and Deering then beat Warren Cokley. During the beating, Cokley managed to remove a small pocket knife from his pocket and cut Deering on the leg. At this point, Georgia Wise ran into the house and began screaming at Wood, Deering, and the others. They immediately left the premises to rendezvous with Davis, and Wise helped Cokley, who was bleeding profusely, to his feet.[4]

The five men met Davis and the van on the highway, and the group returned to Deering's house. When they arrived, they decided that Adams, Terrell, and Davis would take Deering in Adams' car to a hospital in Anniston, Alabama, where they would probably not be recognized, to receive treatment for the cut Deering had received. After Deering had been treated, the four men returned to Georgia. Adams dropped Deering and Davis off at Deering's house. As Adams was driving Terrell home, he asked Terrell why they had beaten Cokley, to which Terrell replied, "black and white."

The Tallapoosa Police Department investigated the Cokley incident. Officers collected blood samples from four different places in the Cokley residence. A sample of Warren Cokley's blood was taken while he was in the hospital, and a sample of Deering's blood was taken after the local police arrested Deering on February 11, 1983. The laboratory results of the samples taken from the Cokleys' house revealed two different blood types. The state crime laboratory determined that Cokley's blood type was similar to three of the four samples taken from the Cokley residence and that the fourth sample was consistent in every respect with that of Deering's.[5]

Following Deering's arrest, the Klavern dissolved. Terrell prepared a resignation notice for Deering dated prior to the Cokley incident and gave it to the Grand Dragon of the Klan in Georgia on February 11, 1983. On July 12, 1983, and August 9, 1983, Deering appeared before a federal grand jury investigating the Cokley inci-

---

2. At 7:45 p.m. that evening, as Mailon Wood and the others were driving to the Cokley residence, the radio dispatcher for the Tallapoosa Police Department, which was located approximately one-half mile from the Cokley address, had received a telephone call from a woman who said that three black males were chasing a white female near a church. The church she identified was on the other side of town from the Cokleys' house. The two officers dispatched to the scene found nothing. As a result of this decoy call, the officers were two or three miles away when, at 8:06 p.m., they received an emergency call to proceed to the Cokley residence.

3. Warren Cokley knew Deering from previous business encounters and recognized him even though Deering was wearing a stocking over his head.

4. Warren Cokley tried to call the Tallapoosa Police Department but was unable to make contact. See supra note 2. He then called the Haralson County Sheriff and reported the incident. Thereafter, Georgia Wise took him to the hospital.

5. The laboratory reported that Deering's blood group and enzymes would appear in approximately .02% of the population.

dent.[6] He denied entering the Cokley residence on February 9, 1983, or being involved in any way with the incident, and maintained that he did not know who was responsible. Further, he testified that his leg had been cut while he was trying to break up a fight in the parking lot of a bar in Anniston, Alabama, and that a friend had been with him.[7] He also stated that he had been a member of the Klan for five or six months and had joined by completing an application he picked up from a man distributing literature on a street in Tallapoosa. He testified that he attended one or two rallies but did not see any of his friends, neighbors, or associates at either of the rallies. He also maintained that he had resigned from the Klan on February 1, 1983, and that ten days passed before he heard anyone mention the Cokleys.

## B.

On August 8, 1984, the grand jury returned a seven count indictment against Mailon Wood, Davis, Billy Wood, Deering, and Adams.[8] Count one charged Mailon Wood and Davis with violating 18 U.S.C. § 241 (1982),[9] by conspiring to interfere, in violation of 42 U.S.C. § 3631 (1982),[10] with the right of Peggy Jo French and her children to associate with blacks in and around their dwelling.[11] Count two charged these two appellants with the substantive section 3631 violation. Counts three and four

---

6. Deering testified before the grand jury under a grant of use immunity pursuant to 18 U.S.C. § 6003 (1982).

7. The friend, Terry Coppock, testified at appellants' trial that he was not with Deering on the night of February 9, 1983, but that he had agreed to provide an alibi for Deering for that night.

8. In exchange for immunity from prosecution Terrell agreed to cooperate with the Government's investigation. He was fitted with a body recorder and transmitter and engaged in several conversations with appellants in which they incriminated themselves. These tapes were played before the jury at appellants' trial.

9. 18 U.S.C. § 241 (1982) provides:

**§ 241. Conspiracy against rights of citizens**
If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

10. 42 U.S.C. § 3631 (1982) provides:

**§ 3631. Violations; bodily injury; death; penalties**
Whoever, whether or not acting under color of law, by force or threat of force willfully injuries [sic], intimidates or interferes with— or attempts to injure, intimidate or interfere with—
(a) any person because of his race, color, religion, sex or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or
(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—
(1) participating, without discrimination on account of race, color, religion, sex or national origin, in any of the activities, services, organizations or facilities described in subsection (a) of this section; or
(2) affording another person or class of persons opportunity or protection so to participate; or
(c) any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex or national origin, in any of the activities, services, organizations or facilities described in subsection (a) of this section, or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—
shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

11. Deering was named in count one as an unindicted co-conspirator. See *supra* note 6.

charged Mailon Wood, Davis, Billy Wood, and Adams with the same conspiracy and substantive offenses with respect to the Cokley incident.[12] Counts five, six, and seven charged Deering with knowingly making false material declarations while under oath before a federal grand jury investigating the incident involved in counts three and four, in violation of 18 U.S.C. § 1623 (1982).[13]

Each appellant moved the district court for a severance, seeking to be tried in separate proceedings. Deering pointed out that he had not been charged in the first four counts of the indictment and that he was the only defendant named in counts five through seven. He argued that the reciprocal spillover effect of a joint trial would deny all the accused a fair hearing. The district court denied appellants' mo-

tions but cured the problem Deering raised by providing for a joint trial before two juries—one empaneled to hear Deering's case, the other to try the remaining appellants.[14] The trial began on October 26, 1984, and on November 8, 1984, the respective juries found appellants guilty as charged.[15] This appeal followed.

## C.

Appellants Mailon Wood, Billy Wood, and Davis ask us to acquit them on all charges on the ground that the evidence was insufficient to convict them. Alternatively, they seek a new trial, claiming that the district court's instructions to the jury on the elements of a section 3631 offense were erroneous. In the discussion that follows in Part II.A. we address the jury instructions,

---

12. Terrell and Deering were named in count three as unindicted coconspirator. *See supra* notes 6, 8.

13. 18 U.S.C. § 1623 (1982) provides:

§ 1623. False declarations before grand jury or court

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

(1) each declaration was material to the point in question, and

(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established suf-

ficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

Count five of the indictment involved Deering's denial that he entered the Cokley residence on February 9, 1983, or that he knew about the incident. Count six concerned Deering's false alibi for the night of the incident. Count seven referred to statements Deering made concerning the extent of his involvement in Klan activities.

14. Appellants do not challenge this procedure in this appeal.

15. Prior to trial, Adams, pursuant to a plea agreement, entered a plea of guilty to count three, his count four charge being dismissed on the Government's motion.

and, concluding that they were correct, consider whether the evidence established the elements of a section 3631 offense.

Appellant Deering contends on appeal that the district court erred in denying his motion to dismiss counts five through seven as duplicitous. Alternatively, he contends that the court erred in refusing either to merge counts five, six, and seven of the indictment or to dismiss counts six and seven on the basis of multiplicity. In Part II.B. we examine each of these allegations of trial court error.

## II.

### A.

Section 3631 provides that whoever "by force or threat of force willfully injuries [sic], intimidates or interferes with ... any person because of his race ... and because he is ... occupying ... any dwelling" shall be subject to criminal sanctions. In charging the jury on the substantive section 3631 counts, the district judge instructed that to prove that a defendant had committed the offense, the Government had to establish: (1) that the defendant used force or threats of force; (2) that he attempted to intimidate or interfere with the victim's right to associate in his or her home with members of another race; (3) that he acted willfully; (4) that he "acted as [he] did because the [victim] was occupying a dwelling [in a particular area] and because [the victim] had there associated with persons of the black race or to prevent them in the future from their association in that house with persons of the black race"; (5) that the victim suffered bodily injury as a result of the offense.[16] The court's charge on the conspiracy to violate section 3631 counts incorporated this instruction.

Appellants argue that the fourth element of the instruction permitted the jury to find a violation of section 3631, provided the other requirements were met, upon a showing that the defendant had interfered with the right of the victim to associate in the victim's home with members of another race. Appellants interpret the statute as requiring a specific intent on the part of the defendant to interfere with the victim's housing rights, i.e., an intent to induce a move out of or prevent a move into the home of the victim's choice.

■ Appellants, however, read the statute too narrowly. The distinction which they seek to draw between conduct designed to force a victim to move from his home (such as firebombing or a direct order to leave) and actions intended to intimidate the occupant into giving up a federally protected right to associate in his home with members of another race[17] as a condition of safe occupancy is without merit. Section 3631 was clearly designed to protect an individual's right to occupy a dwelling of one's choice free from racial pressure. This right, however, means very little if the occupant's physical safety inside that dwelling is contingent upon his refraining from associating with members of another race. The statute prohibits acts of willful intimidation of or interference with a victim "because of his race ... and because he is ... occupying ... any dwelling." Section 3631 nowhere mentions that the acts be designed to force an individual to move; it merely requires that the acts be precipitated by the individual's occupation of a particular house. "Occupation" includes more than mere physical presence within four walls; the term clearly incorporates the right to associate in one's home with members of another race. When the accused interferes with one's association rights within one's home, the accused also interferes with one's occupancy of that home.

16. Appellants do not challenge the fifth element. A section 3631 violation does not require that the victim suffer *bodily* injury; however, where such injury does occur, the defendant is subject to increased sanctions. *See supra* note 10.

17. Discrimination against members of one race because of their associations with members of another race violates 42 U.S.C. §§ 1982, 3604(b) (1982). *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir.1982).

We arrived at the same conclusion in *United States v. Johns*, 615 F.2d 672 (5th Cir.) (per curiam), *cert. denied*, 449 U.S. 829, 101 S.Ct. 95, 66 L.Ed.2d 33 (1980).[18] In *Johns*, the defendants fired a shotgun into a residence occupied by two black men and two white women. The defendants argued that section 3631 did not apply to such conduct. The court, however, found the evidence sufficient to support a finding that the defendants intended by their act to "discourage both interracial living arrangements and interracial dating." *Id.* at 675. The court held that such conduct could be found to interfere with "the rights of the attacked individuals and others to live where they wish regardless of their race or color". *Id.* The defendants' convictions were upheld in the absence of any evidence that the defendants intended to force the victims to move. Implicit in the *Johns* rationale is the interpretation of "occupation" in section 3631 to include the right to associate in one's house with members of other races. We view such an interpretation as persuasive and binding on this panel.

■ We therefore find that the trial judge properly instructed the jury as to the elements of a section 3631 violation. Further, viewing the evidence in the light most favorable to the Government, *see United States v. Carter*, 760 F.2d 1568, 1582 (11th Cir.1985), we conclude that the evidence was overwhelming as to each count of the indictment. In both the French and Cokley incidents it is undisputed that appellants willfully used force against both Peggy Jo French and Warren Cokley to prevent them from asserting their right to associate in their homes with members of other races.

### B.

Appellant Deering contends that the trial court erred in denying his motion to dismiss counts five, six, and seven of the indictment as duplicitous. He contends, alternatively, that the court erred in refusing either to merge counts five, six, and seven, or to dismiss counts six and seven on the basis of multiplicity. We find no error in either ruling.

■ The "error of duplicity is present where more than a single crime is charged in one count of an indictment." *United States v. Ramos*, 666 F.2d 469, 473 (11th Cir.1982). The mere fact, however, that counts five, six, and seven each contained several alleged false statements does not indicate that each count charged more than one offense. Each of the three counts alleged a distinct 18 U.S.C. § 1623 (1982) offense; each required different evidence to establish the crime. Thus, although Deering made many false statements, they were grouped into three offenses. *See supra* note 13. Indeed, had the Government charged each false statement as a separate count, such an indictment might have been multiplicitous. Likewise, had all the statements been charged in a single count, the indictment might have been duplicitous. We agree with the trial court that the indictment in question struck an appropriate balance and was not duplicitous. The trial court was aware of the possible confusion that might arise from having several false statements charged in each count and instructed the jury that to convict it must find that each statement was false. Deering fails to persuade us that the trial court erred in rejecting his claim of duplicity.

As noted, Deering alternatively contends that counts five through seven of the indictment were multiplicitous. We have defined multiplicity as "the charging of a single offense in more than one count." *United States v. Glanton*, 707 F.2d 1238, 1240 (11th Cir.1983) (per curiam). In *United States v. De La Torre*, 634 F.2d 792, 795 (5th Cir.1981), we held that "[s]eparate and distinct false declarations in trial testimony, which require different factual proof of falsity, may properly be charged in separate counts, albeit they are all related and arise out of the same transaction or subject

---

18. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

matter." The three counts in question met this standard. Count five related to Deering's claim that he did not participate in the Cokley incident and was unaware of who did. The evidence proving the falsity of this statement consisted of eye-witness testimony that Deering took part in the assault and an expert's opinion that samples of his blood type were found in the Cokley residence. Count six involved Deering's claim that on the night of the Cokley assault he was with Terry Coppock and received a cut on his leg while trying to break up a fight at a bar. Proof that the alibi was fabricated consisted of testimony of Terrell and Adams that they, along with Davis, took Deering to a hospital in Anniston, Alabama, and the testimony of Coppock that he was not with Deering on the night in question. Count seven related to Deering's statements attempting to cover up the extent of his Klan involvement and denying that he ever heard of or ever spoke about the Cokleys prior to his arrest. Proof of the falsity of these statements consisted of evidence that Deering regularly attended Klavern meetings at the home of Mailon Wood, that he knew other Klavern members, that following one Klavern meeting he spoke to Mailon Wood and Terrell about the Cokleys' interracial marriage, and that he was involved in the earlier French incident. Thus, counts five through seven of the indictment, as they required "different factual proof of falsity," were not multiplicitous under *De La Torre.*

Nor is multiplicity demonstrated by a showing that the false declarations charged in those counts were material to the same issue. As we have stated, "it is simply irrelevant that each false statement was material to the same question before the court." *United States v. Molinares,* 700 F.2d 647, 653 (11th Cir.1983). Although Deering's false statements to the grand jury were interrelated, the counts in the indictment were not multiplicitous.

### III.

Appellants raise several other claims of error, but they are frivolous and require no discussion. Accordingly, the convictions of appellants Mailon Wood, Davis, Billy Wood, and Deering are, severally,

AFFIRMED.