**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1567
_____

UNITED STATES OF AMERICA

v.

BRANDON PIEKARSKY,
Appellant
_____

On Appeal from the District Court
for the Middle District of Pennsylvania
(No. 3-09-cr-00396-1)
District Judge: Honorable A. Richard Caputo

_____

No. 11-1568
_____

UNITED STATES OF AMERICA

v.

DERRICK DONCHAK,
Appellant

_____

On Appeal from the District Court
for the Middle District of Pennsylvania
(No. 3-09-cr-00396-2)
District Judge: Honorable A. Richard Caputo
_____

Argued on January 12, 2012

Before: McKEE, *Chief Judge*, FUENTES and JORDAN,
*Circuit Judges*

(Opinion Filed:  June 18, 2012)

James A. Swetz, Esq.                    (ARGUED)
Cramer, Swetz & McManus, P.C.
711 Sarah Street
Stroudsburg, PA 18360

        *Attorney for Appellant Brandon Piekarsky*


William A. Fetterhoff, Esq.             (ARGUED)
Fetterhoff and Zilli
218 Pine Street
Harrisburg, PA 17101

        *Attorney for Appellant Derrick Donchak*

Thomas E. Perez

2

Assistant Attorney General
Jessica Dunsay Silver
Angela M. Miller                               (ARGUED)
U.S. Department of Justice
Civil Rights Division, Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, DC 20044-4403

*Attorneys for Appellee*

OPINION OF THE COURT

FUENTES, *Circuit Judge*:

Brandon Piekarsky and Derrick Donchak were convicted in federal court for the brutal beating and eventual death of Luis Ramirez, a resident of the Defendants' town. The Defendants were charged with criminal violation of the Fair Housing Act, 42 U.S.C. § 3631, which penalizes actions taken against an individual on account of his race, color or national origin, and with the specific intent to intimidate the victim or others like him from exercising their right to housing free of discrimination. On appeal, they argue that the District Court erred in instructing the jury that the Government was not required to prove that issues of race and occupancy were the Defendants' only motivations in beating Ramirez. The Defendants also raise other issues, including whether double jeopardy barred their federal trial and whether the evidence was sufficient to support a conviction under § 3631. For the reasons that follow, we will affirm.

**I.**
**A.**

This case arises out of an exceedingly disturbing series of events that culminated in the beating and eventual death of Luis Ramirez, a resident of Shenandoah, Pennsylvania, on July 12, 2008. Donchak and Piekarsky, then eighteen and sixteen years old, respectively, were also residents of Shenandoah. On the night of July 12, 2008, they were accompanied by a group of other young Shenandoah

4

residents: Brian Scully, Ben Lawson, Colin Walsh and Josh Redmond, all of whom played high school football with, and were close friends of, the Defendants. Scully, Walsh and Redmond were key witnesses for the federal prosecution in this case.

At trial, the testimony revealed that members of this group regularly made derogatory comments about Hispanic or Latino individuals, and frequently voiced their displeasure with the presence of such individuals in Shenandoah. The friends often referred to such individuals as "Mexicans" because they considered it to be a derogatory term. (Append. 221.) Scully testified that he, Donchak and Walsh would frequently discuss the increasing Hispanic population in Shenandoah, and would say things like "Get them out of here," or "[I]t's not good for our [t]own." (*Id.*) Lawson testified that these sentiments were shared by many people in his high school class. (Append. 211-12.) Walsh testified that Donchak, in particular, was very vocal in these sentiments, and that he "really didn't like Hispanic people." (Append. 379.) He also stated that Donchak often wore a t-shirt that said "Border Patrol," and drove through town blasting "The White Man Marches On"—a white supremacist anthem that glorifies the use of violence against minorities—from the speakers of his pickup truck. (Append. 379, 381.)

On the night of Ramirez's beating, Piekarsky, Donchak, and their friends encountered Luis Ramirez and became engaged in a verbal disagreement with him. That verbal disagreement escalated to a physical altercation which resulted in the savage beating of Ramirez by Donchak, Piekarsky and other members of the group as he lay on the ground. Ramirez died two days later as a result of the injuries he sustained.

5

Prior to that encounter, the group had been partying and drinking malt liquor near a creek in Shenandoah for two or more hours. They then attended a neighborhood Polish American block party, but were asked to leave shortly after they arrived, when Piekarsky became involved in a verbal altercation with another partygoer and had to be physically restrained by his friends.

It was after they left the party, while walking through a neighborhood park, that the group encountered Ramirez, who was accompanied by Roxanne Rector. Scully made a comment to Rector to the effect that it was too late for her to be out. Ramirez, who was sitting nearby on a park swing, stood up and said something to the group in Spanish. Scully responded to Ramirez, saying, "This is Shenandoah. This is America. Go back to Mexico." (Append. 149.) From there, the situation escalated. Ramirez responded with more words, and took out his cell phone to call someone. Donchak called Ramirez a "Spic," (Append. 228) and Walsh told Ramirez to "Get the fuck out of here" (Append. 387, 639). Ramirez, at Rector's insistence, began walking backwards out of the park and away from the group.

When Ramirez reached the street, he turned his back to the group and continued to walk away. Piekarsky, joined by Walsh and Scully, ran after Ramirez. Piekarsky and Ramirez began fighting, and Piekarsky eventually picked Ramirez up and threw him to the ground. Piekarsky apparently attempted to kick Ramirez while he was down, but tripped and fell over. By the time Ramirez stood up, Donchak had run over from the park and begun repeatedly punching Ramirez in the face, calling him a "fucking Spic." (Append. 389-90.) Ramirez eventually fell to the ground, at which point the rest of the group joined in on the beating.

6

At this point, the group was positioned across the street from the park, in front of a home. Donchak, Walsh, Piekarsky and Scully stood over Ramirez and kicked him repeatedly. Walsh testified that he kicked Ramirez in the lower body "just once," but that "everybody else was kicking him in the upper part, in his head and his chest and his upper body." (Append. 391.)

The kicking stopped when Victor Garcia—Ramirez's friend, whom he had called on his cell phone at the beginning of the altercation—arrived with his then-fiancée Arielle, whom the Defendants knew from school. As Garcia approached, the group broke up and began walking down the street. One member of the group called at Garcia, screaming, "Fucking Mexican." (Append. 545-546.) Donchak, who was still standing nearby, threw a few more punches at Ramirez and, as he walked away, turned and again said, "Fuck you Spic." Walsh addressed Arielle and said, "This isn't racial." (Append. 392.) Scully turned and said, "Go home, you Mexican motherfucker." (Append. 233-234.) Apparently provoked by these comments, Ramirez—who was standing at this point—charged at Scully, and the two began fighting. Walsh ran up and punched Ramirez in the face, causing him to fall backwards "like a brick," slamming his head against the concrete. (Append. 527.) Then, as Ramirez lay on the ground, motionless, Piekarsky ran up and kicked Ramirez in the side of the head. Arielle testified that the kick delivered

7

was so forceful that it made a "crack" sound, and caused Ramirez's head to fly to the side.[1] (Append. 488.)

Witnesses testified that, immediately after Piekarsky kicked him in the head, Ramirez began convulsing and making "snoring" sounds. (Append. 488.) The Defendants and their friends fled the scene at this point. One member of the group—either Piekarsky or Scully—yelled, "Tell your fucking Mexican friends to get the fuck out of Shenandoah or you're going to be fucking laying next to him." (Append. 325.) Someone called 9-1-1, but Ramirez was unconscious and unresponsive when medical help arrived. By that time, his head was misshapen, and his face was swollen. He was taken by helicopter to a nearby trauma center. Two days later, he died.

In the days after the accident, the Defendants and their friends hatched a plan to conceal what had happened during the fight with Ramirez. That plan appears to have included the Defendants, their friends, Piekarsky's mother, and three officers of the Shenandoah Police Department—Officer Jason Hayes, Lt. William Moyer and Chief of Police Matthew Nestor,[2] all of whom were friends of the Piekarsky family.

---

[1] Medical testimony produced at trial stated that the kick, combined with the fall that preceded it, were the cause of the damage to Ramirez's skull and his eventual death.

[2] In a separate federal proceeding, Nestor, Moyer and Hayes were tried together on charges of conspiracy and obstruction of justice, stemming from these events. Following trial, a jury convicted Nestor of obstruction of justice in violation of 18 U.S.C. § 1519. Moyer was convicted of making false

Witnesses testified at trial that, in the hours immediately following the incident, both Donchak and Piekarsky spoke with Hayes and Moyer. The group of men who had been present at the fight also met at Donchak's home to discuss the fight. Piekarsky, who was talking with Moyer and Hayes at this time, called the group and assured them that he had told the police that the fight was not racially motivated, had only been a fight between Walsh and Ramirez, and that Walsh had acted in self defense. He also withheld the fact that he had kicked Ramirez in the head.

Piekarsky and his mother arrived at Donchak's house later than the others and told the group that they needed to "get a story." By this time, they had learned that Ramirez would likely die from his injuries. At the same meeting, according to the testimony of Redmond and Scully, the Defendants joked about getting the name "Lupe" tattooed on their bodies, given that Ramirez was "Mexican." (Append. 242, 302, 650.) The evidence also showed that, during this time, Piekarsky's mother was in constant contact with Hayes and Moyer, as well as Chief Nestor.

The day after the assault, Scully was interviewed by Moyer, Hayes and two detectives from the Schuylkill County District Attorney's Office. Scully testified at trial that, at this

---

statements in a police report, in violation of 18 U.S.C. § 1001. Hayes was acquitted of all charges. *See United States v. Nestor*, No. 3:09-CR-397, 2011 U.S. Dist. LEXIS 55890 (M.D. Pa., May 25, 2011). We recently affirmed those convictions on appeal. *United States v. Moyer*, 674 F.3d 192 (3d Cir. 2012).

interview, he intentionally withheld information regarding the drinking the group had done the night before, the kick to Ramirez's head and the use of racial epithets. Shortly after, the group met again—this time explicitly in order to get their stories straight. The boys' parents discussed the situation in the living room, while the boys spoke in the back yard. The group agreed to tell the police that no one had kicked Ramirez and that no one had been drinking. They also agreed to tell the police that the fight was not racially motivated and to hide the fact that they had yelled racial slurs during the beating.[3]

It was only after the District Attorney's Office fully took over investigation of the case—roughly one week after the incident—that the group's stories began to unravel. During follow-up interviews with the District Attorney's Office, Redmond, Scully and Walsh recanted their previous statements and told investigators what had really happened on the night Ramirez was beaten.

**B.**

In July 2008, the Defendants were indicted in Shuylkill County Court with aggravated assault, simple assault, reckless endangerment of another person and ethnic intimidation—a general hate-crime under Pennsylvania law.[4]

---

[3] For a complete account of the details of the cover-up by the police, see *Moyer*, 674 F.3d 192.

[4] Under Pennsylvania's ethnic intimidation statute, an individual violates the statute where he acts (1) with malicious intention toward the actual or perceived race, color, religion, etc. of an individual or group of individuals; and (2) commits a offense relating to arson, criminal mischief or

Donchak was also charged with hindering apprehension or prosecution, corruption of minors with alcohol, underage drinking, and furnishing alcohol to minors. Piekarsky, because he was alleged to have been the person who kicked Ramirez in the head, was also charged with third-degree murder and voluntary manslaughter. State authorities also charged him with criminal solicitation to hinder apprehension or prosecution/giving false reports to law enforcement authorities, and with underage drinking.[5]

In August 2008, federal authorities became more involved in the investigation of Ramirez's death. At several points in their respective investigations, state and federal authorities shared information and resources in investigating these crimes, and in conducting interviews of key witnesses.

The state trial commenced in April 2009. After five days of trial and eight hours of deliberation, a Schuylkill County jury acquitted Piekarsky of all but the simple assault charge against him. Donchak was convicted of simple assault, corruption of minors and furnishing of alcohol to

---

other property crimes as defined by Pennsylvania law; or (3) commits and crime against the targeted individual's person. 18 Pa. C.S. § 2710.

[5] County prosecutors also charged Colin Walsh with murder, voluntary manslaughter, aggravated assault, simple assault, reckless endangerment of another person, and ethnic intimidation. Walsh signed a proffer agreement and cooperated with the state and federal officials. The charges against Walsh were, ultimately, dismissed. Walsh thereafter served as a key witness against the Defendants.

minors.  Both Donchak and Piekarsky were sentenced with 6-23 months' imprisonment.  Both were released on probation approximately six months later.

The state court verdict triggered public outcry from members of the town, special interest groups and public figures. Shortly after the verdict, then-Governor Rendell wrote the Department of Justice, acknowledging the Department's ongoing investigation into the assault on Ramirez and requesting that it consider bringing civil rights charges against Piekarsky and Donchak.  Following the conclusion of its investigation into the matter, the Department of Justice filed federal charges.

In December 2010, a federal grand jury indicted Piekarsky and Donchak on charges of interfering with Ramirez's federal housing rights under 42 U.S.C. § 3631. That statute criminalizes conduct that interferes with, intimidates or injures an individual because of his race or national origin, and because he is or is considering occupying a dwelling in a given neighborhood. *Id.* Donchak was also charged with conspiring to falsify, and aiding and abetting in the falsification of, official police reports in violation of 18 U.S.C. § 371, and with obstruction of justice pursuant to 18 U.S.C. §§ 1519 and 2.  Both Defendants pled not guilty to the charges and filed a joint motion to have the indictment under § 3631 dismissed for failure to state a claim, and under the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, in light of their acquittal in state court.  The District Court denied these motions.

In February 2011, following trial, a federal jury in the Middle District of Pennsylvania found the Defendants guilty of criminal violations of the Fair Housing Act. Donchak was

also convicted of conspiring with local police, and with aiding and abetting in the falsification of official police reports in frustration of a federal investigation.[6] The District Court sentenced Piekarsky to 108 months' imprisonment, to be followed by three years of supervised release. Donchak received a sentence of 108 months' imprisonment for the housing crime, 108 months' imprisonment on the aiding and abetting crime under 18 U.S.C. § 1519, and 30 months' imprisonment for the aiding and abetting violation under 18 U.S.C. § 371, all terms to run concurrently and to be followed by three years' supervised release. This appeal followed.

## C.

The Defendants now challenge, jointly and individually, numerous aspects of their convictions, their sentences, and certain decisions made by the District Court at trial. Together, they contend that the federal trial, which followed their acquittals in state court, violated the Double Jeopardy Clause of the Fifth Amendment and that the District Court erred in instructing the jury on the appropriate legal standards under 42 U.S.C. § 3631. They also argue that the District Court misapplied United States Sentencing Guideline § 2H1.1 when it calculated their Offense Levels using Voluntary Manslaughter—rather than Involuntary

---

[6] At the close of the Government's case-in-chief, Donchak moved to dismiss one count of obstruction of justice for insufficient evidence. The District Court granted that motion. Count 3 of the indictment, which also charged obstruction of justice under § 1519, was not dismissed.

13

Manslaughter—as the underlying offense for purposes of their conviction under § 3631.

Individually, Piekarsky also contends that the District Court erred in precluding him from arguing, before the jury, the differences between race, ethnicity, alienage and immigration status, and that § 3631 did not apply under the facts of this case; that the District Court unduly limited his ability to cross-examine a witness about her feelings about the state-court acquittal; and that there was insufficient evidence to convict him under § 3631. Donchak challenges the sufficiency of the evidence supporting his convictions under §§ 1519 and 371. He also argues that there was a variance between his indictment, which alleged a single conspiracy to falsify reports in hindrance of a federal investigation under § 371 and the government's proof at trial, which he argues proved, at best, two conspiracies.

The District Court had jurisdiction under 18 U.S.C. § 3231. Our review is proper pursuant to 28 U.S.C. § 1291.

## II.

Donchak and Piekarsky appeal the District Court's instruction to the jury on Count One of the Indictment, which charged a violation of the Fair Housing Act of 1968, 42 U.S.C. § 3631. Under § 3631, it is a crime to intimidate or interfere with any person "because of his race . . . and because he is or has been . . . occupying . . . any dwelling." 42 U.S.C. § 3631(a). Similarly, it is a crime to "intimidate such person or any other person or any class of persons from" occupying a dwelling. *Id.* § 3631(b).

At trial, Donchak and Piekarsky requested that the District Court provide an additional instruction to the jury on the meaning of § 3631 and proposed the following language:

> [I]n order to find the Defendants . . . guilty of Count One[,] the jury must be satisfied that the Government has proven beyond a reasonable doubt that the Defendants were motivated to commit an unlawful assault against Luis Ramirez because of his race AND because he was occupying a dwelling in Shenandoah. *The Government must prove that the assault of Luis Ramirez occurred because of both of those reasons. The word "because" in the statute is to be understood in its common meaning. Dictionaries define the word "because" to mean "for the reason that," or "by reason of," or "due to."*

(Supp. Append. 121 (emphasis and capitalization in original).)  In effect, Donchak and Piekarsky urged the District Court to instruct the jury that race and residency had to be the sole or primary motivation behind the assault.

The District Court refused to instruct the jury in this manner, holding that, under statutes in which racial animus is a basis for or an element of the crime, race need only be a motivating factor, and not the predominant purpose.  Instead, the District Court instructed the jury as to the elements of a crime under § 3631, which included a showing that the "defendants acted on [account] of racial bias and the occupancy of a dwelling in Shenandoah." (Append. 994.)  It then went on to explain to the jury that, in order to satisfy the

15

third element of the crime, the government was required to prove that the defendants

> acted because of Mr. Ramirez's race and because of the race of other Latino persons occupying dwellings in Shenandoah and because Luis Ramirez and other Latino persons were occupying dwellings in Shenandoah. * * * *The government need not prove that these were [the Defendants'] only motivation[s].*

> In other words, the government need not prove that race and occupancy were the only reasons for their actions. *The presence of other motives, such as personal dislike, anger or revenge does not make the conduct any less a violation of the statute*, Section 3631.

(Append. 994-95 (emphasis added).)

On appeal, Donchak and Piekarsky maintain that this instruction, referred to as a "mixed motive" instruction, misstated the legal standard governing the specific intent requirement under § 3631. They argue that the instruction was in error because it "ignored the plain text of § 3631" by "diluting" the "plain, universally understood meaning" of the word "because" and inviting the jury to convict the Defendants "even if they found that Piekarsky and Donchak had other motives." (Piekarsky Br. at 49; Donchak Br. at 37.) Instead, they submit that "mixed motive" instructions under § 3631 are improper, and ask this Court to vacate the conviction under § 3631 and remand for a new trial.

Where, as here, a criminal defendant argues that the district court's jury instructions misstated the applicable law,

16

our review is plenary. *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005); *United States v. McLaughlin*, 386 F.3d 547, 552 (3d Cir. 2004). Where the language of a district court's given instruction is legally sound and the court has additional proposed language by a party before it, "[r]efusal to give a proposed instruction is reversible error only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant." *United States v. Urban*, 404 F.3d 754, 779 (3d Cir. 2005) (quoting *United States v. Davis*, 183 F.3d 231, 250 (3d Cir. 1999) (internal quotations omitted).

Thus, we are presented with two questions: first, whether the District Court's "mixed motive" instruction to the jury "misstated the applicable law" under § 3631; second, whether the District Court abused its discretion in refusing to include the Defendants' proposed language purporting to define or underscore the meaning of the word "because" under § 3631.

## A.

Under § 3631, a party may be convicted where he, "by force or threat of force willfully injures, intimidates or interferes" with–

> (a) any person because of his race, color, religion, sex, handicap * * *, familial status * * *, or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or

17

applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or

(b) *any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from–*

(1) *participating*, without discrimination on account of race, color, religion, sex, handicap * * *, familial status * * *, or national origin, in any of the activities, services, organizations or facilities described in [§ 3631(a)]; or

(2) affording another person or class of persons opportunity or protection so to participate[.]

42 U.S.C. § 3631(a), (b) (emphasis added). The statute, passed in 1968 as part of a suite of legislation designed to address racial discrimination at the height of the Civil Rights Movement, was intended to target the various means by which certain classes of individuals were discriminated against in renting, purchasing or owning property in certain neighborhoods. S. Rep. No. 90-721 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837, 1842-43. It was also meant to provide a gap-filling measure for enforcing individual rights to housing, free of discrimination or intimidation, where Congress believed state law had fallen short or had abdicated responsibility altogether. *Id.* Under § 3631, when an individual commits such an act of intimidation by inflicting physical injury on another person, he or she is subject to

18

criminal prosecution and a sentence of up to ten years. *Id.* at 1841.

We begin by noting that the District Court's instructions to the jury on the elements of proof required under § 3631 restate—almost verbatim—the language of the statute itself. To the extent the instructions employ the language of § 3631, they do not, of course, misstate the law. The relevant question, then, is whether the District Court's statement that "the presence of other motives, such as personal dislike, anger or revenge does not make the conduct any less a violation of the statute" in some way misstates what § 3631 requires.

This Circuit has not previously examined or determined the extent to which a showing of mixed motives is legally sufficient to support a conviction under § 3631. The opinions of our sister circuits, however, provide ample support for the proposition that a conviction based on "mixed motives" falls well within the reach of § 3631, so long as the evidence is sufficient to show that the defendant's actions were taken because of the defendant's animus toward a protected class and on account of an intent to intimidate a member of that protected class of individuals from exercising his housing rights under the Act. Since the Fifth Circuit's decision in *United States v. Johns*, 615 F.2d 673 (5th Cir. 1980), courts have been in general agreement that, under § 3631, the "presence of other motives . . . does not make [a defendant's] conduct any less a violation of § 3631," *id.* at 676.

Most recently, in *United States v. Craft*, the Seventh Circuit upheld the conviction under § 3631 of a defendant who had committed arson at several structures in South Bend,

19

Indiana—only two of which were homes owned by individuals who fell within a protected class under § 3631. The defendant challenged the sufficiency of the evidence supporting his convictions under § 3631, arguing in part that he had ulterior motives for burning the houses. One of the resident-victims, a black man, owed him money, and the defendant argued that *that* was the reason he had burned the victim's house. The Seventh Circuit found this argument unavailing, stating that the government was not required to prove that racial animus was the defendant's "sole motivation." "Rather, it was only required to prove that the victims' race or ethnicity partially motivated" the crimes. 484 F.3d 922, 926 (7th Cir. 2012) (citing *United States v. Magleby*, 241 F.3d 1306, 1310 (10th Cir. 2001)). *Craft* was consistent with language from the Seventh Circuit's earlier opinion in *United States v. Hartbarger*, in which that court noted, in a footnote, that the district court had correctly instructed the jurors in a § 3631 case that "defendants could be found guilty even if they had mixed motives in committing the act." 148 F.3d 777, 784 n.6 (7th Cir. 1998), *overruled on other grounds by United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003). Though the defendants' appeal in *Hartbanger* was not itself a challenge to the district court's "mixed motives" instruction, that court's language is nonetheless telling, given that the *Hartbarger* defendants had argued earlier in the proceedings that they had burned a cross in the victim's yard for personal reasons—a previous verbal altercation with him—and not because of his race. 148 F.3d at 779, 784 n.6; *see also Magleby*, 241 F.3d at 1310 (approving instruction in a § 3631 case, challenged on other grounds, in which the district court stated that "[i]t does not matter that the defendant may have had more than one motive

20

in performing the act as long as . . . race was one of his motives").

Because these cases involve challenges to the sufficiency of evidence under a conviction under § 3631 they are demonstrative of what passes legal muster under that provision. Donchak and Piekarsky concede that the reasoning of these cases would foreclose their line of argument, but urge us to disregard them because those holdings, they argue, "ignore the plain text of § 3631." (Piekarsky Br. at 49; Donchak Br. at 31.) We disagree.

Indeed, in analyzing similar text in an analogous context, our own case law makes clear that a "mixed motive" jury instruction sets forth the correct legal standard for crimes involving a specific intent to deprive a victim of a protected right. *See United States v. Ellis*, 595 F.2d 154 (3d Cir. 1979). In *Ellis*, we reviewed jury instructions given regarding criminal charges under 18 U.S.C. § 241, which prohibits conspiracies undertaken to deprive an individual of his civil rights, or "because of his having so exercised the same." The district court in that case refused a proposed defense instruction that stated that the intent to deprive the victim of his civil rights needed to be the "predominant purpose" of the conspiracy. On appeal, we affirmed the district court's decision, noting that the proposed instruction would inappropriately invite jurors to override the guiding purpose of the legislation—the prevention of constitutional injuries—by also finding that the parties had some other permissible purpose. *Ellis*, 595 F.2d at 162; *see also United States v. Johnstone*, 107 F.3d 200, 210 (3d Cir. 1997) (approving under 18 U.S.C. § 1842 a jury instruction stating it did not matter "that a defendant may also have been motivated by hatred, anger or revenge, or some other emotion"); *cf. United*

21

*States v. Bledsoe*, 728 F.2d 1094, 1098 (8th Cir. 1984) (upholding mixed motives instruction under 18 U.S.C. § 245 that stated that "the presence of other motives . . . does not make his conduct any less a violation" of the statute); *Craft*, 484 F.3d at 926 (stating that, under § 3631, the government need only prove that "race or ethnicity partially motivated" the crimes).

The Defendants argue that *Ellis* is inapposite, since the defendants in *Ellis* "did not have 'mixed motives,'" and because the legislation in *Ellis* is not identically worded to § 3631. (Piekarsky Br. at 46; Donchak Br. at 28.) We find these arguments unpersuasive. First, the Defendants ignore the fact that the statute we analyzed in *Ellis* does, in part, rely on the word "because" in stating the proscribed specific intent. An individual violates § 241 when he conspires to "injure, oppress, threaten, or intimidate" any person in the exercise of his constitutional rights and privileges, "or *because of* his having so exercised the same." Second, while *Ellis* does not refer to the defendants' having "mixed motives," specifically, it does concern the defendants' "purpose" in conspiring as they had to violate the victim's constitutional rights. 595 F.2d at 162. The parallel to this case is readily apparent: A purpose, like a motive, is "the reason for which something is done." OXFORD ENGLISH DICTIONARY (2012); *cf.* Supp. Append. 121 (Defendants' Proposed Jury Instruction) (proposing the District Court define "because" for purposes of § 3631, to mean "by reason of," "for the reason that," and "due to").

Thus, though the language of the statutes may differ, we consider our interpretation under § 241 to be instructive in this case. To that end, the import of *Ellis* is the degree to which it underscores this Circuit's concern that the general

22

purpose of such statutes—those designed to deter and punish acts taken with the specific intent of depriving a victim of a federally recognized right—not be undermined by the ease with which a defendant can argue that he had some additional motive or purpose in acting as he did. This is a reading that is reinforced by the plain text of § 3631 and the legislative purpose in its enactment.

The Defendants' argument that the District Court impermissibly diluted the legal standard under § 3631 necessarily relies on the implicit proposition that the statute uses the word "because," under its "ordinary meaning" (Piekarsky Br. at 49; Donchak Br. at 31-32), to mean "primarily," or even "singularly." To be sure, the Defendants are correct that a word in a statute, unless otherwise defined, is understood by its ordinary meaning. However, we decline to accept the Defendants' argument that the ordinary meaning of the word "because" carries the weight that they would assign to it.

The word "because" is defined to mean "for the reason that," "on account of," and "by reason of." OXFORD ENGLISH DICTIONARY (2012). Those meanings do not, necessarily, connote exclusivity or predominance. Nor, viewing the word in the context of the statute as a whole, are we compelled to adopt such a reading. As § 3631 itself makes clear, something can be done "because of" multiple reasons. *See* § 3631 (premising violation on actions taken "because of" race and "because of" occupancy). Certainly, then, "because" cannot connote exclusivity.

Indeed, the inclusion of such language would threaten to limit drastically the availability of the protections afforded by § 3631—a result not intended by Congress in the drafting

23

of this statute. Rather, in passing the legislation at hand, Congress intended to "broadly prohibit" the use of violence as a means of intimidating individuals from exercising their federal rights, and to create a powerful, useful federal tool for filling in state-law shortcomings in this area. *See* S. Rep. No. 90-721, 1968 U.S.C.C.A.N. at 1837-45. It did so by targeting and criminalizing actions taken with a very specific proscribed intent: the intent to injure, intimidate or interfere with a person's exercise of his or her rights, under the Fair Housing Act, because of that person's race, color, religion, sex, handicap, familial status or national origin. Where a jury, presented with all the evidence, determines that that specific intent is demonstrated beyond a reasonable doubt in the case before it, the dictates of § 3631 have been met and a conviction is appropriate. *See Johns*, 615 F.2d at 675 ("The presence of other motives," so long as the proscribed intent is found, "does not make [the] conduct any less a violation of 42 U.S.C. § 3631.").

The Defendants argue that this reading of § 3631 is too broad—that, under this construction, "a single racial epithet . . . uttered in the anger and intemperate speech of an entirely random street fight, caused by an insult or by merely personal animus, could become the basis for a conviction under the Fair Housing Act." (Piekarsky Br. at 50; Donchak Br. at 32-33.) Of course, as the facts above demonstrated, this is not a case involving "a single racial epithet."

Bearing in mind that the issue before us concerns the legality of mixed motive instructions given to the jury, which considers their application in light of the evidence and the arguments offered by both the prosecution and the defense, we are confident that—even under a "mixed motives" jury instruction—a single untoward comment would not yield

such a heavy handed result. Nor is it likely that a single racial epithet, taken alone, would be sufficient to demonstrate that the Defendants' conduct was motivated by an intent to discriminate on the basis of the victim's attempt to peacefully reside in a given neighborhood.

As we have said, Congress has criminalized certain conduct, taken with specifically proscribed intent, through its enactment of § 3631. As other Circuits' cases dealing with § 3631 make clear, at trial, a defendant has the opportunity to present his defense and to demonstrate to the jury that, whatever the facts, he did not hold this specific intent at the time of the alleged crime. It is the jury that is tasked with evaluating the facts and determining whether § 3631 applies, or whether a defendant's use of racial epithets or his personally held biases are instead merely incidental to his other motivations for acting as he did. Our holding here—which merely limits the word "because" to what we take to be its plain, ordinary, congressionally intended meaning—has not so "diluted" the language of that statute so as to render that evaluation meaningless.

**B.**

We next consider whether, despite the legal soundness of its own instructions, the District Court abused its discretion in declining to include the language regarding the meaning of the word "because," proposed by the Defendants. As previously stated, a district court abuses its discretion in refusing to give a proposed instruction only insofar as the proposed language (1) is correct; (2) is not substantially covered by other instructions; and (3) is so important that its omission prejudices the defendant. *Urban*, 404 F.3d at 779 (citations omitted). Applying this standard, we conclude that

25

the District Court did not abuse its discretion in rejecting the Defendants' proposed additional language.

Aside from requesting that the Court remove the mixed motives language from the jury instructions—language which we have found to be a correct statement of the law under § 3631—the Defendants' also requested that the Court explain the definition of the word "because" for the jury. As the Defendants repeatedly point out, "because" is a word with an ordinary meaning. As a result, the addition of a clarifying definition—as proposed by the Defendants—was not necessary to the jury's understanding of the instructions it received. To the extent that inclusion of the word "because" was intended to instruct the jury that "because" means "only" or "predominantly," that reading is in conflict with the law, and the District Court was correct to reject that language.

## III.

In addition to the Defendants' challenges to the jury instructions, Piekarsky also challenges the sufficiency of the evidence supporting his conviction under § 3631.[7] "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005) (quotation marks omitted). Where, as here, a defendant has preserved the issue for appeal, we review the evidence in the light most favorable to the Government. *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010). We afford great deference to, and draw all reasonable inferences in favor of, the jury's verdict. *Id.*

---

[7] Donchak does not raise this challenge on appeal.

Piekarsky argues that the evidence presented at trial was insufficient to establish a violation of § 3631 because (1) Ramirez was an undocumented alien, had "no right to be in the United States" and thus "[did] not have a federally protected right to housing in the United States;" and (2) Piekarsky did not know that Ramirez "occupied or intended to occupy a dwelling in Shenandoah."[8] (Piekarsky Br. at 29-30.)

On the law alone, we find these arguments wanting. The text of § 3631(a) and (b)—the provisions under which the Defendants were charged—contains no requirement that the victimized individual be a citizen of the United States or otherwise lawfully residing here. Instead, both (a) and (b) criminalize conduct against "any *person* because of his race, color, . . . or national origin. *Id.* This language rests in stark contrast to the text of § 3631(c), which does contain an explicit limitation on the scope of its protection, reaching only "any *citizen*" who exercises, or aids others in the exercise of, their federally guaranteed housing rights. We find this omission fatal to Piekarsky's argument. *See Prestol Espinal v. Att'y General*, 653 F.3d 213, 223-24 (3d Cir. 2011) ("[W]here Congress 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally

---

[8] The defendants also raised this issue in a joint pretrial motion to dismiss this count of the indictment, arguing that it "fail[ed] to allege that they knew [Ramirez] occupied a dwelling in Shenandoah." (Append. 18 (District Court Pretrial Memorandum, Aug. 11, 2010).)

and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

As to whether the evidence was sufficient to demonstrate that Piekarsky knew that Ramirez "occupied or intended to occupy" a residence in Shenandoah, this argument is similarly unavailing. As the language of the statute makes clear, the victimized individual need not be a resident or future resident of a given neighborhood in order for the protections of § 3631 to apply. Rather, under § 3631(b), it is enough that an individual is victimized "in order to intimidate . . . any other person or any class of persons" from exercising their federally guaranteed housing rights.

Thus, under § 3631(b), all the Government needed to prove at trial was that Ramirez was injured because the Defendants intended to send a message to others that they were not welcome to live in Shenandoah on account of their "race, color . . . or national origin."[9]  *Cf. United States v.*

---

[9] Piekarsky argues in his reply that, whatever the law under § 3631, the District Court *itself* stated that the government was required to show that Piekarsky knew or believed that Ramirez was a resident of Shenandoah, because the District Court said, during jury instructions, that § 3631 "requires proof that Mr. Piekarsky and/or Mr. Donchak intended to intimidate or interfere with Luis Ramirez because he was occupying a dwelling in Shenandoah." (Append. 992-95.) However, reading the instructions in their entirety, it is sufficiently clear that the District Court provided an accurate statement of the law as we have described it. Shortly after making the statement relied on by Piekarsky on appeal, the District Court clarified that the "government must simply

28

*Vartanian*, 245 F.3d 609, 615 (6th Cir. 2001) (stating broad congressional intent to prevent housing discrimination and intimidation, generally).   Under this reading of § 3631, and viewing the evidence in the light most favorable to the Government, we have no trouble concluding that the evidence before the jury was sufficient to support the guilty verdict under § 3631.

To be sure, this case lacks the explicit and overt reliance on the racially charged symbols—such as cross-burning—that are so immediately evocative of an intent to intimidate an individual on account of his race, his color or his national origin.  *See, e.g.*, *Magleby*, 241 F.3d at 1313 (describing burning crosses as "symbols of racial hatred"). Similarly, the nexus to housing issues or housing rights is less explicit here than it is in cases involving crosses burning in front yards or targeted acts of arson.  *See, e.g.*, *Craft*, 484 F.3d at 926.  However, such explicit evidence is not required to support a finding of specific intent.

In cases involving a necessary finding of specific intent, a jury may draw inferences of subjective intent from evidence of the defendant's objective acts, and from circumstantial evidence.  *Riley*, 621 F.3d at 333.  Though a

show that Mr. Piekarsky . . . intended to do something that would have the effect of interfering with Mr. Ramirez's right to occupy a dwelling in Shenandoah."  It later described the relevant intent as an intent to interfere with the rights of Mr. Ramirez and "other Latino persons" to "live in Shenandoah free of racial intimidation."  (*Id.*)

defendant may deny having the requisite intent, and may offer evidence suggestive of that argument, the jury may weigh all the evidence before it and choose to disbelieve him if "his words and acts in light of all the circumstances make his explanation seem improbable." *Magleby*, 241 F.3d at 1312 (quotation marks omitted).

At trial, the government presented evidence that, on the night of July 12, 2008, the Defendants and their friends hurled an array of racially charged comments at Ramirez, repeatedly calling him a "spic" and, alternately, a "fucking spic," and a "fucking Mexican." Prior to the physical beating of Ramirez and immediately after, Scully—a member of the group was heard to say, "This is Shenandoah. This is America. Go back to Mexico." (Append. 150, 228.) During the fight, Scully also turned and said, "Go home you Mexican motherfucker." (Append. 386-87.) The same individual told Ramirez that Shenandoah was "our town" and that Ramirez didn't "belong" there. (Append. 387.) Finally—and in light of the extensive amount of violence and racial epithets which preceded it—after the beating had ended, and Ramirez lay unconscious and convulsing on the ground, Piekarsky yelled, "Tell your fucking Mexican friends to get the fuck out of Shenandoah, or you're going to be fucking laying next to him."[10] (Append. 325.)

---

[10] Walsh testified at trial that it was Scully who made this comment. (Append. 645.) Eileen Burke, a neighbor who witnesses the fight, testified that it was Piekarsky. (Append. 325.)

Viewing this evidence—coupled with the other testimony about the Defendants' general dislike of Hispanic or Latino individuals moving into Shenandoah, *supra*—in the light most favorable to the government, we conclude that a reasonable juror could rationally conclude that the nature of the beating of Luis Ramirez, the extent of the violence involved in this case, and the gratuitous nature of the racial epithets flung about during the beating—both at Ramirez, and at his friend, Victor Garcia—were, taken together, indicative that Donchak and Piekarsky intended to injure Ramirez with the purpose of intimidating him, or other Hispanic or Latino individuals, from residing in Shenandoah.

Piekarsky was afforded the opportunity, at trial, to present his defense and to show the jurors that this was merely a case—in the words of Piekarsky's attorney—of "a single racial epithet . . . uttered in the anger and intemperate speech of an entirely random street fight." (Piekarsky Br. at 50.) In light of the other evidence before them, the jurors were not convinced. Instead, the jury found that the specific intent elements of § 3631 were met and it issued a guilty verdict. We see no basis to upset that finding.

## IV.

Regarding their Double Jeopardy claim, the Defendants argue that, because they "were previously charged, tried, and acquitted of all but the Simple Assault [charge] in Schuylkill County court on the same incident," the federal charges against them were barred by the Double Jeopardy clause of the United States Constitution. (Piekarsky Br. at 18; Donchak Br. at 22.) Because the doctrine of Dual Sovereignty applies to this case and forecloses the Defendants' argument on appeal, we affirm the District

Court's determination that Double Jeopardy did not bar the federal prosecution of this case.

The Double Jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Importantly, however, there are limits to the reach of the protection afforded by this language. As is relevant to this case, under the doctrine of Dual Sovereignty, a state prosecution does not bar a subsequent federal prosecution for the same conduct. *United States v. Gricco*, 277 F.3d 339, 352 (3d Cir. 2002) (citing *Abbate v. United States*, 359 U.S. 187, 194 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 137 (1959); *United States v. Lanza*, 260 U.S. 377, 382 (1922)). The doctrine, articulated by the Supreme Court in *Bartkus v. Illinois* and *Abbate v. United States*, is a recognition of the fact that the states and the federal government are separate sovereigns, with distinct interests in criminalizing and prosecuting certain conduct.

The Defendants concede that, on its face, the doctrine of Dual Sovereignty applies to bar this line of argument. Seeking to avoid this result, they urge this Court to adopt as law and apply what some have called the "*Bartkus* exception" to the Dual Sovereignty rule. That exception, to the extent it has been recognized by federal courts, stems from language in which the Supreme Court "alluded to the possibility that dual federal and state prosecutions might run afoul of the general rule affirming such prosecutions if one authority was acting as a surrogate for the other, or if the state prosecution was merely 'a sham and a cover for a federal prosecution.'" *United States v. Berry*, 164 F.3d 844, 846 (3d Cir. 1999) (quoting *Bartkus*, 359 U.S. at 123-24).

As we stated in 1999, in *Berry*, "[a]lthough we have previously recognized the potential existence of an exception to the dual sovereignty rule under *Bartkus*, we have never applied the exception to overturn a second state or federal prosecution." *Id.* at 847 (citation omitted). Nor do we see reason to do so here. Though the federal and state authorities appear to have been cooperative with each other in conducting their investigations, and in sharing resources for the interviewing of witnesses, the Defendants have failed to point this Court's attention to any evidence, beyond mere supposition, that the state authorities were puppets or surrogates for the federal authorities in this case. Nor have the Defendants presented this Court with anything to support their claim that the state trial was a mere "sham," conducted in anticipation of the federal proceedings. In this case, the state and federal government each decided to prosecute the Defendants based on facts implicating its own valid interests as sovereign—Pennsylvania's in criminalizing ethnic intimidation under 18 Pa. C.S. § 2710; the United States in prosecuting criminal housing discrimination under 42 U.S.C. § 3631. Viewing the unfolding of these proceedings in their entirety, the state trial "simply cannot be considered 'a sham and a cover' for a federal prosecution." *See Berry*, 164 F.3d at 847; *see also United States v. Pungitore*, 910 F.2d 1084, 1106-07 (3d Cir. 1990) (concluding that the fact that "there was a considerable amount of federal-state cooperation" did not, alone, create a double jeopardy problem). We thus affirm the District Court's conclusion that Double Jeopardy did not bar the subsequent federal prosecution of this case.

## V.

Having carefully considered the Defendants' various remaining arguments, we find them to be without merit. We

therefore affirm the final conviction, judgment, and sentence of the District Court, in all respects.