*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0090P (6th Cir.)
File Name: 01a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　*v.*　　　　　　　　　　No. 00-1702

RICHARD VARTANIAN,
　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-81072—Bernard A. Friedman, District Judge.

Argued: January 30, 2001

Decided and Filed: March 30, 2001

Before: DAUGHTREY and GILMAN, Circuit Judges;
HEYBURN, District Judge.[*]

────────────────

**COUNSEL**

**ARGUED:** Stacey M. Studnicki, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellant.
Kevin K. Russell, UNITED STATES DEPARTMENT OF

───────────────

[*] The Honorable John G. Heyburn, II, United States District Judge for
the Western District of Kentucky, sitting by designation.

1

JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellee. **ON BRIEF:** Stacey M. Studnicki, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Kevin K. Russell, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Appellee.

————————

### OPINION

————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The defendant, Richard Vartanian, was convicted under two subsections of 42 U.S.C. § 3631 for interfering with the civil housing rights of three real estate agents and an African-American family, by threatening bodily injury and death because of the family's decision to purchase a home in the defendant's previously all-white neighborhood. Having been sentenced to five months in prison, 180 days of home confinement, and one year of supervised release, Vartanian appeals to this court, alleging violations of his right to confront the witnesses against him and of his right to be free from double jeopardy. He also asserts that the government adduced insufficient evidence to support one of the convictions, arguing that the proof failed to show that a threat was delivered directly against the home-buyers. We find no reversible error and affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

When Ernest and Kemlyn Stringer decided to purchase a new home for their family in the Detroit suburb of Harper Woods, they enlisted the aid of real estate agent Steven Weiss and made an offer on a home at 18980 Eastwood that was accepted by the seller and her agents, Kathy and Mike Martin. As with most home sales, however, the final purchase was made contingent upon the buyers receiving a favorable report from a certified home inspector prior to the scheduled closing date. Hence, the Stringers met at the home with the inspector,

defendant's comments as threats to them and their children, and that Vartanian should now be held liable for those foreseeable consequences.

In a final challenge to the legitimacy of his convictions, Vartanian submits that the information returned against him was multiplicitous because it alleged in two counts the same criminal activity. As we have consistently held, however, "[a] defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other." *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir.), *cert. denied*, 120 S.Ct. 2732 (2000) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Those protections against imposition of double punishment for commission of the same act are present in this instance because the elements of the crimes prohibited by 42 U.S.C. § 3631(a) and 42 U.S.C. § 3631(b)(1) are distinct, even though the same threatening conduct is sufficient to satisfy both allegations.

Through the provisions of § 3631(a), Congress intended to punish threats and other acts of intimidation in situations in which the defendant acts against a particular victim *because of the victim's race* and in which *the victim* is in the process of buying, selling, or leasing a home. In contrast, to prove a violation of § 3631(b)(1), the government need prove only that the intended victim of that crime was offering housing services without discrimination. Unlike the situation involved in a § 3631(a) violation, the victim in a § 3631(b)(1) case need not be chosen because of his or her race and need not be personally in the market to buy, sell, or lease a home. Consequently, the two provisions address separate evils and may be punished separately, as long as the defendant communicates an intention to threaten both sets of victims for the proscribed reasons.

For the reasons set out above, we AFFIRM the judgment of the district court.

light most favorable to the prosecution, in finding all elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We find no legal insufficiency on this record.

Given the defendant's comments that he would not have invested money in a pool in his yard had he known that an African-American family was moving in across the street from his property, a rational trier of fact could conclude that Vartanian's anger and threats were directed not only to the real estate agents for their practice of assisting all qualified buyers in finding suitable housing, but also to the particular individuals innocently seeking new housing for their family. Moreover, given the viciousness of the communicated threats, the jury was justified in inferring that the defendant knew or should have known that a reasonable agent would relay the tenor of those comments, if not the comments themselves, to the prospective purchasers, and that such communication would naturally also place the purchasers in fear of their lives and safety. In fact, as a result of Vartanian's comments, the Stringers justifiably felt compelled to take special precautions to ensure the well-being of their family members.[2] It is not unreasonable for a jury to conclude that Vartanian was, or should have been, aware that such defensive actions were but natural reactions flowing from comments made to third parties, that the Stringers reasonably construed the

---

[2]Kemlyn Stringer testified at trial that, after moving into the defendant's neighborhood, the Stringers altered their lifestyles to protect themselves and their children from further violence from Vartanian or from other self-described, bigoted neighbors. Particularly, Ms. Stringer stated:

> [T]he children were allowed to ride their bikes only in the back yard, in the front yard when my husband or I were out. They were not allowed to open the doors at all. Also, we rearranged the furniture. We put the furniture so it wasn't in front of the window. We have a big glass window in the front, and we made sure the couch was not directly in front of that window to be sure if a brick or gunshots or something that came into the window, it wouldn't hit anybody.

Weiss, and the Martins for the examination of the property and structure. After receiving word of the inspector's approval, the inspector and the Stringers left the area and the three real estate agents remained to lock up the house and congratulate each other on the consummation of the sale.

As they stood talking in the driveway of the home, the seller's next-door neighbors, the DeCraenes, walked hurriedly to the agents and animatedly explained how the real estate professionals had ruined the DeCraenes' lives by facilitating the sale of the property to an African-American family. Although the conversation initiated by the DeCraenes was quite clearly racially charged, witnesses to the discussion did not recall hearing threats of any kind articulated by those neighbors.

Within minutes, however, the defendant, who owned the property across the street from the seller, ran across the road and began ranting at the agents assembled there. He exclaimed that he would not have invested $10,000 in a swimming pool in his yard had he known African-Americans would move in across the street, and then backed Kathy Martin up into her vehicle, all the while spewing invective. The defendant also told Kathy Martin that he and his neighbors would boycott the Martins' real estate agency, that he had a friend who was a police officer who could trace the agents from their vehicle's license plate number, and that he (Vartanian) would find the Martins, destroy their car, chop them into little pieces, and bury them in the backyard where nobody would ever find them. Mr. DeCraene corroborated the account given by the real estate agents and related that Vartanian "said that he could cut these people in pieces or something."

Before the situation escalated further, the Martins and Weiss left the area, only to reassemble later that evening at the local police station to report the incident. The police official assigned to the case contacted Vartanian and arranged to interview him the following morning. At that time, the defendant attempted to cast his actions in an innocent light.

Despite conceding that he had copied down the Martins' license plate number in order to have a friend on the Detroit police force "run a check" on the car, Vartanian denied threatening the agents. Instead, he claimed only that he had stated, "I'm going to buy a house near your house and rent it to blacks. See how your neighbors like it. They will probably cut you up into little pieces and bury you in the back yard."

Shortly after the defendant's altercation with the real estate agents, Weiss contacted the Stringers and requested a meeting with them without the Stringers' children present. At that meeting, he informed them of the threats uttered by Vartanian and volunteered to return the couple's earnest money if they chose to rescind their purchase offer. The Stringers nevertheless decided to go through with the purchase of the home, but they kept strict watch over their children so as to protect them from possible attacks or mischief from their neighbors.

Eventually, Weiss and the Stringers filed a civil suit against Vartanian, alleging violations of the housing provisions of Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. §§ 37.2501-2507. This litigation eventually resulted in a judgment and a substantial monetary award in favor of the plaintiffs. Simultaneously with the unfolding of the civil proceedings, the federal grand jury returned an indictment against the defendant, charging him with one count of using "force and threat of force . . . [to] intimidate [the real estate agents]" and, in a second count, with "intimidat[ing] and interfer[ing] with an African-American family with regard to their opportunity to . . . purchase" the house in Harper Woods by "force and threat of force" against the agents. When that indictment was later dismissed due to irregularities in the selection of grand jury members in the Eastern District of Michigan in light of this court's decision in *United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998), the prosecution procured a superseding information charging the same violations of 42 U.S.C. §§ 3631(b)(2) and (a).

Vartanian, defendant herein, *did by force and threat of force willfully intimidate and interfere with and attempt to injure, intimidate, and interfere* with an African-American family with regard to their opportunity to negotiate for purchase, contract for purchase, purchase and occupy the dwelling at 18980 Eastwood, Harper Woods, Michigan, *by accosting and threatening approximately three real estate sales persons with bodily injury* . . . .

(Emphasis added.) This challenge to the sufficiency of the information must, therefore, fail.

Vartanian nevertheless insists that there was insufficient evidence to convict him of a violation of 42 U.S.C. § 3631(a) because he made no direct threat *to the Stringers*, who had already departed from the Eastwood neighborhood by the time of Vartanian's arrival on the scene. The defendant misunderstands the reach of the statute, however. Congress's obvious intent in enacting the provision under which Vartanian was convicted was to protect citizens from intimidating discrimination in all aspects of housing selection and purchase. The fact that a threat or act of intimidation was not addressed directly to the protected individual does not mean that those words or conduct cannot or will not have the effect desired by the defendant. In the same manner that tossing a rock and a threatening note into a vacant home recently toured by an African-American potential buyer may be considered an effort to intimidate the would-be purchaser and/or seller, communicating threats to real estate agents working on behalf of minority individuals may, under certain circumstances, also serve to threaten or intimidate the actual customers. In this case, where the obvious intent of the defendant was also to protest the action of the individual buyers, not just of the agents themselves, we conclude that a rational trier of fact would be justified in inferring that the import of the threat would be transmitted to the buyers. And, established case law provides that sufficient evidence to sustain a conviction need only consist of evidence that justifies a rational trier of fact, viewing the testimony in the

government read to the jury only portions of Weiss's direct testimony that recounted the agents' confrontation with Vartanian and Weiss's subsequent reactions, information that was properly admissible and non-objectionable at either trial. The portion of the cross-examination of agent Weiss at the civil trial that was read at the criminal proceeding, moreover, was brief and consisted entirely of Weiss's agreement that Vartanian never mentioned the Stringers directly during his tirade. Again, the motives of the civil action lawyer would necessarily be synonymous with those of the criminal defense attorney regarding the elicitation or possible challenge to such testimony.

On two separate bases, the defendant also seeks reversal of his conviction under the second count of the information, which alleged that he "willfully intimidate[d] and interfere[d] with" the Stringers' purchase of the Harper Woods home in violation of 42 U.S.C. § 3631(a). First, Vartanian contends that, because he did not threaten the Stringers directly, the prosecution adduced insufficient evidence to support that conviction. Second, he maintains that count two was multiplicitous because the same illegal *activity* charged in that count, threatening and intimidating real estate agents to prevent a property transfer to an African-American buyer, was also charged in the first count of the information.

In his challenge to the sufficiency of the information and the convicting evidence, Vartanian first curiously argues that count two did not specifically allege, as required[1], that the defendant threatened the Stringers. In plain language, however, the information states:

That on or about August 16, 1994, within the Eastern District of Michigan, Southern Division, Richard

---

[1]Pursuant to the pertinent provisions of 42 U.S.C. § 3631(a), it is illegal to injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, by force or threat of force, "any person because of his race . . . and because he is or has been . . . purchasing, . . . or negotiating for the . . . purchase of any dwelling . . . ."

At the conclusion of the criminal trial, Vartanian was convicted by a jury on both counts and was sentenced to concurrent prison terms of five months, followed by 180 days of home confinement. The defendant was further sentenced to one year of supervised release and was ordered to pay a special assessment of $50. From those convictions, Vartanian now appeals.

### DISCUSSION

In challenging his convictions, Vartanian first alleges that the district court violated his Sixth Amendment right to confront the witnesses against him. In support of that claim, the defendant notes that the trial court allowed the prosecution to read into evidence testimony offered by a now-deceased witness who had testified at an earlier civil trial against Vartanian. The defendant asserts that even though he enjoyed the assistance of a civil defense attorney and of a criminal defense attorney at the respective trials, the lawyers did not have similar motives to develop direct, cross-examination, and redirect testimony at the two proceedings.

In pertinent part, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Read literally, the constitutional mandate "would require, on objection, the exclusion of any statement made by a declarant not present at trial," including "virtually every hearsay exception, a result long rejected as unintended and too extreme." *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). In fact, the United States Supreme Court has stated that "[f]rom the earliest days of our Confrontation Clause jurisprudence, we have consistently held that the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v. Wright*, 497 U.S. 805, 813 (1990).

Nevertheless, "[t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay."

*Roberts*, 448 U.S. at 65. First, because of the constitutional preference for face-to-face accusations, the constitutional provision establishes a rule of necessity, requiring the prosecution either to produce or to demonstrate the unavailability of the declarant. *See id.* Second, because the clause seeks to augment accuracy in the fact-finding process by ensuring an opportunity to test adverse evidence, courts will countenance admission of hearsay testimony in criminal trials only when "indicia of reliability" mark the testimony with sufficient trustworthiness. *See id.* at 66. *See also United States v. Licavoli*, 725 F.2d 1040, 1049 (6th Cir. 1984). Such "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

In challenging the admissibility at his criminal trial of testimony given by real estate agent Steven Weiss at an earlier civil trial, the defendant does not contest the fact that Weiss was unavailable to testify. Indeed, the parties agree that Weiss died between the conclusion of the civil proceedings and the beginning of the criminal trial. *See* Fed. R. Evid. 804(a)(4). Rather, Vartanian focuses his objection on his belief that the evidence admitted fails to fall within "a firmly rooted hearsay exception." In response, the government contends that Weiss's prior testimony was indeed admissible because it fell squarely within the recognized hearsay exception for former testimony. Pursuant to Federal Rule of Evidence 804(b)(1), if a declarant is unavailable as a witness, a court may accept:

> [t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and *similar motive to develop the testimony by direct, cross, or redirect examination*.

(Emphasis added.)

Weiss's testimony in the civil litigation addressed allegations that the defendant communicated threats to the real estate agents intended to intimidate and thereby also interfered with the Stringers' rights to purchase free from intimidation. Similarly, the object of Vartanian's criminal trial was to determine whether the defendant voiced threats intended to intimidate and thereby interfere with the agents' sale and the Stringers' purchase of the home. Furthermore, the parties do not dispute that Vartanian's attorney during the civil proceedings had every opportunity to develop facts and theories in support of his client's legal position. Where the parties diverge in their legal analysis of the legitimacy of the district court's decision to admit Weiss's former testimony is in their understandings of the *motives* of the civil and criminal attorneys to develop such testimony.

Before this court, the defendant insists that allowing Weiss's civil trial testimony to be admitted in the criminal proceeding without the opportunity for cross-examination effectively nullified his right to attack the witness's account of the incident at issue, because Vartanian's civil attorney did not have the same motive or legal strategy as his criminal defense attorney. Specifically, the defendant contends that the plan at the civil trial was to establish that Vartanian was not liable to the Stringers and to Weiss for any threatening or intimidating comments because any objectionable statements were made not to them, but rather to Kathy and Mike Martin, who had not filed any civil claims against the defendant. By contrast, Vartanian contends that because one count of the criminal information lodged against him alleged threats and intimidation against the Martins *and* against Weiss, the concessions made and strategy employed in the civil trial actually helped prove the government's case against him in the criminal proceedings.

On a purely theoretical level, Vartanian's argument has some appeal. In its application to the facts of this case, however, the assertion is meritless. It is clear that the