The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 10, 2025

**2025COA38**

**No. 21CA1443, *Peo v Harmon* — Constitutional Law — Sixth Amendment — Confrontation Clause; Evidence — Hearsay Exceptions — Declarant Unavailable — Former Testimony**

As a matter of first impression, a division of the court of appeals addresses whether a prosecutor may introduce evidence in a criminal trial of a deceased witness's testimony from a civil trial under the unavailable declarant exception to the hearsay bar.

Because the defendant's counsel was fully motivated to vigorously cross-examine the deceased declarant at the civil trial and had ample opportunities to do so, the division concludes that the trial court properly admitted the testimony and therefore did not violate the defendant's confrontation rights.

Court of Appeals No. 21CA1443
Delta County District Court No. 19CR17
Honorable Steven L. Schultz, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

William Henry Harmon,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SCHUTZ
Welling and Kuhn, JJ., concur

Announced April 10, 2025

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, William Henry Harmon, appeals the judgment of conviction entered on a jury verdict finding him guilty of attempted first degree murder and two counts of stalking.  We affirm the judgment.

¶ 2      The resolution of Harmon's claims requires us to address the novel issue of whether a prosecutor may introduce into evidence in a criminal trial a deceased witness's testimony that was given at a prior civil trial.  Because Harmon's counsel was fully motivated to vigorously cross-examine the witness at the prior civil trial and had ample opportunities to do so, we conclude that the trial court did not violate Harmon's confrontation rights or the hearsay rule by admitting the testimony at the criminal trial.

I.      Background and Procedural History

¶ 3      The jury heard the following evidence that supports the verdicts.

¶ 4      Paul and Anna Hershberger[1] owned and operated Hershberger Construction, LLC (Hershberger).  The company specialized in constructing steel buildings.  In September 2014, Hershberger and

---

[1] Due to their shared last name, we refer to Paul and Anna by their first names to avoid confusion.  We mean no disrespect in doing so.

Harmon entered into a contract to erect such a building on Harmon's property. When they signed the agreement, Harmon was unsure where he wanted to place the building, so they agreed to store it at Hershberger's headquarters, which was directly across the street from Paul and Anna's residence.

¶ 5 In 2015, the parties' relationship deteriorated due to Harmon's uncertainty about when and where he wanted to place the building and delays in completing the project. Lyle Wingard, a former Hershberger employee and Paul's son-in-law, testified that, in August 2015, during a phone conversation about the building's location, Harmon told Wingard that he would shoot Paul and stated that "Paul is still being nice to me; he doesn't believe that I'm going to kill him." Wingard informed Paul of Harmon's threat. Anna and Paul were unnerved by the threat and took various safety measures, including installing security cameras and creating an escape plan from their home in the event Harmon showed up at their residence.

¶ 6 In response to the threat, Paul sent Harmon a letter in which he terminated the contract. The letter banned Harmon from the Hershberger property and gave him until the end of 2015 to engage a third party to remove the building. The letter included a check

with a partial refund of the contract price.  This, however, wasn't the end of the parties' involvement with each other.

A.     The Civil Litigation and Subsequent Interactions

¶ 7     Throughout 2016, the parties remained locked in a dispute over the termination of the contract.  After the parties were not able to reach an agreement, in 2017, Harmon sued Hershberger for breach of contract, requesting that the civil court rescind the contract and award him the entire amount that he had paid for the building.  Hershberger counterclaimed for damages and lost profits, and defended the breach of contract claim on the basis that Harmon's death threat against Paul had rendered Hershberger's performance of the contract impossible.

¶ 8     Judge Steven L. Schultz presided over the civil case and set the matter for a two-day bench trial in July 2018.  Paul testified on both days about the contract and the nature of the threat.  Harmon's counsel examined Paul extensively about various aspects of the parties' interactions.  Harmon also testified during the civil trial and conceded that he had threatened to shoot Paul and confirmed making that threat in his subsequent conversation with Wingard.

¶ 9     In November 2018, the civil court issued a written ruling finding that Harmon's threat did not excuse Hershberger's performance under the contract, particularly in view of the parties' subsequent discussions.  The court ultimately found both parties at fault for nonperformance.  It ordered Hershberger to refund a portion of the purchase price and ordered Harmon to remove the steel building from Hershberger's property within sixty days.

¶ 10    Harmon was apparently unable to move on despite the civil court's resolution of the case.  Throughout December 2018, Harmon engaged in a series of actions that alarmed Paul and Anna, including parking in their driveway on at least six different occasions.  On one occasion, Harmon showed up at their home twice on the same day but did not try to contact them directly.  They reported the incidents to the police.

¶ 11    In late December 2018, Anna noticed Harmon following their vehicle as they travelled to church.  At the criminal trial, Harmon admitted following Paul and Anna to church on multiple occasions, purportedly because he had questions about their honesty and wanted more information about their beliefs.  He stated that he remained a few blocks behind them after they left the house and sat

in the church parking lot and observed them while they were in church. Harmon testified that he did not intend to scare or bother Paul and Anna, and that he intentionally stayed away from them.

### B. The Arrest, Criminal Trial, and Conviction

¶ 12 In January 2019, things came to a head after Anna saw Harmon in their driveway and called the police. Shortly after the call, law enforcement stopped Harmon as he drove away from the property. He appeared intoxicated.

¶ 13 Deputy Wade Carney testified that, after he informed Harmon that the stop was in relation to a possible harassment claim, Harmon admitted that he had threatened to shoot Paul and "everybody knows that." Harmon was arrested on suspicion of driving under the influence of alcohol after failing roadside tests.

¶ 14 The police seized Harmon's vehicle shortly after his arrest and recovered bullets, zip ties, and two loaded guns, one of which was hidden within an empty six-pack container. The police also found a note in Harmon's home that read in part:

> Told me he was going to Africa for month.
>
> I told him that I had a buyer for site and could
> make [$]45,000 would rather have building
> will get started soon

No schedule

(1) Told him put the building up!!

(2) Give me my money back

(3) Or I will shoot you

¶ 15     Based on this investigation, Harmon was eventually charged with multiple criminal offenses[2] including, as relevant here, attempted first degree murder, stalking (credible threat), and stalking (serious emotional distress).

¶ 16     The criminal case was assigned to Judge Schultz. The People filed a "notice" asking Judge Schultz to consider recusing based on his involvement in the prior civil case, but they did not file a recusal motion or request that he recuse himself from the case. Defense counsel joined the notice but did not make any argument in support of recusal. Neither party submitted any affidavits in support of the notice. Judge Schultz declined to recuse himself.

¶ 17     In 2020, Paul died in an unrelated motorcycle accident. Because Paul was unavailable to testify at the criminal trial, the People moved to admit portions of the transcript of Paul's testimony

---

[2] Harmon was charged with seven counts, including driving under the influence of alcohol, but he only challenges the attempted first degree murder and stalking (credible threat) convictions.

at the civil case concerning Harmon's threat. The trial court admitted the testimony over defense counsel's objection after finding that, during the civil trial, Harmon's counsel had an opportunity and similar motive to cross-examine Paul about Harmon's threat.

¶ 18 After a six-day trial, the jury convicted Harmon on each of the submitted counts, including attempted first degree murder and the two stalking charges. The trial court sentenced Harmon to ten years in community corrections.

## II. Issues on Appeal

¶ 19 Harmon argues on appeal that the evidence was insufficient to convict him of either attempted first degree murder or stalking (credible threat). Next, he argues that the trial court erred by admitting Paul's testimony from the civil trial, and relatedly that the court erred by allowing the jury to hear portions of Paul's testimony read from the official transcript rather than the audio recording of that testimony. Harmon also argues that the trial judge erred by failing to recuse himself from presiding over the criminal case. Finally, he argues the court erred by failing to give an instruction

for the lesser nonincluded offense of harassment.  We address and reject each of Harmon's contentions in turn.

## A.    Sufficiency of the Evidence Claims

¶ 20    Harmon begins by challenging the sufficiency of the evidence for the attempted first degree murder and stalking (credible threat) convictions.

### 1.    Standard of Review

¶ 21    We review the record de novo to determine whether the evidence was sufficient both in quantity and quality to sustain a conviction.  *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010).

¶ 22    To determine whether the prosecution presented sufficient evidence, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *Id.* (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)).  In a jury trial, the jury "decides difficult questions about the weight it determines to give conflicting evidence."  *Id.* at 1293.  Appellate courts do not sit as a

8

thirteenth juror to second-guess the jury's weighing of the evidence. *See id.*

### 2. Attempted First Degree Murder

#### a. Applicable Law

¶ 23    A person commits first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person." § 18-3-102(1)(a), C.R.S. 2024.  A person commits attempted first degree murder if, acting with the kind of culpability otherwise required for the commission of first degree murder, he engages in conduct constituting a substantial step toward the commission of the offense.  *People v. Caldwell,* 43 P.3d 663, 672 (Colo. App. 2001).  A substantial step is any conduct, whether act, omission, or possession, that is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.  *People v. Lehnert,* 163 P.3d 1111, 1113 (Colo. 2007).

¶ 24    The question of what constitutes a substantial step cannot be resolved by a mechanical rule or litmus test; rather, the analysis turns on whether the defendant's conduct "strongly corroborates a sufficiently firm intent on his part to commit the specific crime he is

charged with attempting." *Id.* at 1115. A behavior, including, but not limited to, scouting the place contemplated for the commission of the offense, searching out the potential victim, or possessing materials designed for an unlawful purpose may be considered in evaluating the firmness of a defendant's criminal purpose. *Id.*

### b. Application

¶ 25 Harmon contends that the prosecution failed to show that he took a substantial step toward completing first degree murder. He argues that, because the court had ordered him to remove the building from Hershberger's property within sixty days, he had a legitimate purpose to be at Paul and Anna's property; he routinely carried a gun; he did not display a weapon to anyone on the day he was arrested; and he was driving away from the property when the police stopped him. Thus, he argues, the facts do not support the conclusion that he intended to murder Paul. The People counter that this and other evidence must be viewed in the light most favorable to the verdict, and that when so viewed, it is sufficient to support the verdict. We agree with the People.

¶ 26 Viewing the evidence and the reasonable inferences arising therefrom in the light most favorable to the verdict, as we must, we

conclude there is adequate evidence to support the jury's finding that Harmon's conduct went beyond mere preparation and constituted a substantial step toward committing first degree murder. Indeed, Harmon told Wingard that he would shoot Paul and told Deputy Carney that he had threatened to shoot Paul. Harmon's handwritten note confirms this intention. Moreover, the jury heard evidence that, before departing from his home that day, Harmon had told his wife that he was going to kill the person who had taken money from him.[3] And his subsequent actions supported the conclusion that he intended to make good on his threat to shoot Paul.

¶ 27     Although Harmon may have routinely carried a weapon, the jury could also have found that his possession of guns on the day in question was anything but routine. He brought a loaded handgun to the property of the man he had repeatedly followed, confronted, and threatened to shoot. He concealed the handgun by taping it

---

[3] During her examination, Harmon's wife denied saying that Harmon made these statements to her. But the investigating officer who spoke to Harmon's wife later testified that she reported these statements, and the jury was therefore permitted to consider the statements as substantive evidence. *See* § 16-10-201, C.R.S. 2024.

11

inside an empty six-pack container. The jury could reasonably have concluded that the hidden handgun or the concealed shotgun and ammunition were part of a plan to murder Paul.

¶ 28   Based on this evidence, we conclude that a reasonable juror could have determined that Harmon had taken a substantial step toward murdering Paul. Thus, we reject Harmon's contention that the evidence was insufficient to support his attempted first degree murder conviction.

### 3.   Stalking

¶ 29   Harmon also challenges the sufficiency of the evidence related to his conviction for stalking (credible threat). *See* § 18-3-602(1)(a), C.R.S. 2024.

### a.   Applicable Law

¶ 30   To establish stalking (credible threat), the prosecution must prove beyond a reasonable doubt that the defendant directly, or indirectly through another person, and knowingly made a credible threat to a person and, "in connection with the threat," repeatedly followed, approached, contacted, or placed under surveillance that person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship.

*Id.* "Conduct 'in connection with' a credible threat means acts that further, advance, promote, or have a continuity of purpose, and may occur before, during, or after the credible threat." § 18-3-602(2)(a).

¶ 31 The supreme court has interpreted the phrase "in connection with" to mean that the act "must further, promote, or advance the credible threat." *People v. Baer*, 973 P.2d 1225, 1230 (Colo. 1999). Whether an act is "in connection with" a "credible threat" is a question properly left to the jury based on the content and context of the threat and subsequent conduct. *Id.*

b. Application

¶ 32 Harmon contends that, because he only made one credible threat against Paul — back in 2015 — his conduct almost four years later could not be deemed to be "in connection with" the 2015 threat.

¶ 33 The People argue that there was a reasonable factual basis to find Harmon guilty of stalking because, under the totality of the circumstances, the jury could reasonably have concluded that his actions were to further his undisputed 2015 credible threat. We agree.

¶ 34     During the 2018 civil trial, Harmon told a court deputy at the courthouse — within earshot of Anna — that he may be returning after the lunch break in handcuffs.  After the trial, he repeatedly followed Paul and Anna.  Harmon told his wife that he was going to kill the person who took money from him.  And when he was arrested, Harmon told police officers that he had threatened to shoot Paul and that he was at Paul and Anna's home looking for an opportunity to make good on his threat.

¶ 35     On this evidence, a reasonable juror could conclude that Harmon's conduct in late 2018 and January 2019 was in connection with his 2015 credible threat to shoot Paul.  *Cf. People v. Suazo*, 87 P.3d 124, 126-27 (Colo. App. 2003) (concluding that a defendant contacting the victim numerous times in person and by telephone repeatedly asking to see her was conduct connected to a prior threat to kill the victim if she did not see him).  Thus, we conclude that there was sufficient evidence to support Harmon's conviction for stalking (credible threat).

## B. Admitting Paul's Testimony

### 1. Additional Facts

¶ 36 Before the criminal trial, the prosecution disclosed that, in view of Paul's death, it intended to introduce into evidence portions of Paul's testimony given during the civil trial. More specifically, the People endorsed approximately twenty-five pages of Paul's testimony in which Paul addressed Harmon's threat and his efforts to resolve the contract dispute.

¶ 37 Harmon argued that Paul's testimony from the civil trial was hearsay, and that it should not be admitted because Harmon's counsel at the civil trial did not have an adequate opportunity or similar motive to develop Paul's testimony. *See* CRE 804(b)(1).

¶ 38 In a thorough written order, the court concluded that Paul's testimony at the civil trial was admissible. It reasoned that Paul's civil testimony was "testimonial"[4] and therefore subject to the Confrontation Clause, but that the Confrontation Clause was not violated because Harmon's counsel thoroughly examined Paul. The

---

[4] Neither party challenges the criminal court's conclusion that Paul's testimony was "testimonial" for purposes of the Confrontation Clause, and we therefore do not address it further.

15

court also concluded that Harmon's counsel at the civil trial had an adequate opportunity and motive to cross-examine Paul, and therefore the testimony was admissible under Rule 804(b)(1).

¶ 39    After the court ruled that Paul's civil testimony was admissible, Harmon filed a motion to admit the FTR[5] audio recording of Paul's testimony in lieu of reading the certified transcript.  The trial court denied the motion, and at trial the court reporter read approximately twenty-five transcript pages of Paul's testimony to the jury.

¶ 40    On appeal, Harmon argues that his convictions should be reversed because the trial court (1) violated his right to confrontation under the United States and Colorado Constitutions; (2) improperly applied CRE 804(1); and (3) improperly had the reporter read the transcript, rather than playing the FTR recording of Paul's testimony.  We address each contention in turn.

2.    Standard of Review and Applicable Law

¶ 41    We review a trial court's evidentiary rulings for an abuse of discretion.  *Campbell v. People*, 2019 CO 66, ¶ 21.  "A trial court

---

[5] The initials FTR refer to "For the Record," the audio-recording system used in district court proceedings.

16

necessarily abuses its discretion if its ruling is based on an erroneous view of the law." *People v. Vanderpauye*, 2021 COA 121, ¶ 32 (citing *People v. Voth*, 2013 CO 61, ¶ 15), *aff'd*, 2023 CO 42. So if, as in this case, the court's ruling depends on its interpretation of a statute or rule, we review that interpretation de novo. *People v. Salas*, 2017 COA 63, ¶ 30. Whether a trial court's ruling violates a defendant's constitutional rights presents a question of law that we also review de novo. *People v. McFee*, 2016 COA 97, ¶ 28.

### a. Confrontation Clause

¶ 42 The United States and Colorado Constitutions guarantee criminal defendants the right to confront witnesses called to testify against them. *People v. Reynolds-Wynn*, 2024 COA 33, ¶ 23. The Confrontation Clause of the United States Constitution provides that a defendant shall be entitled to "be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, though not identically, the Colorado Constitution provides that "[i]n [a] criminal prosecution[] the accused shall have the right to . . . meet the witnesses against him face to face." Colo. Const. art. II, § 16.

¶ 43 A defendant's right of confrontation "is primarily secured through cross-examination." *Margerum v. People*, 2019 CO 100,

¶ 10. "Cross-examination allows a party to interrogate a witness's 'perceptions and memory' and is also 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

### b. Hearsay

¶ 44 Hearsay is a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay is not admissible unless it fits into an applicable exception. *See* CRE 802-804.

### 3. Application

### a. Constitutional Challenges

¶ 45 In his pretrial motions challenging the admissibility of Paul's civil trial testimony, Harmon cited the Confrontation Clauses of the United States and Colorado Constitutions. But all of the arguments and related case law he submitted were based on the Confrontation Clause found in the Fourteenth Amendment to the United States Constitution. Indeed, he cited the Colorado confrontation clause only in the final paragraph of his original motion and supplement thereto.

¶ 46    On appeal, however, Harmon urges us to interpret and apply

Colorado's confrontation clause in a manner that affords a

defendant broader protections than those afforded by the

Fourteenth Amendment's Confrontation Clause.  We reject this

effort for procedural and substantive reasons.

¶ 47    From a procedural perspective, by failing to develop the

argument below, Harmon deprived the prosecution and the trial

court of the opportunity to address the issue, which, in turn,

deprives us of the benefit of the trial court's reasoned resolution.

Because of these inherent deficiencies, we generally do not address

constitutional arguments raised for the first time on appeal.

*Martinez v. People*, 244 P.3d 135, 139 (Colo. 2010).

¶ 48    But regardless of whether Harmon preserved his state

confrontation clause argument, it fails on the merits.  Harmon

concedes that under *Crawford v. Washington*, 541 U.S. 36, 53-54

(2004), the use of prior testimony by a non-testifying witness is

generally admissible in a criminal trial if the witness is unavailable

and the accused had an opportunity to cross-examine the witness

when the statement was made.  But Harmon points to the Colorado

Supreme Court's decision in *People v. Fry*, in which the court

suggested that a non-testifying, unavailable witness's testimony is admissible only if the defendant had an "*adequate* prior opportunity" to cross-examine the witness at the prior hearing. 92 P.3d 970, 976 (Colo. 2004) (emphasis added). And the court in *Fry* found that the opportunity to cross-examine the witness in the prior proceeding was not adequate to permit the testimony's admission at the subsequent trial. *Id.* at 981.

¶ 49 But *Fry* arose in a procedural context far different from that in this case. In *Fry*, the People sought to introduce at a criminal trial the testimony of an unavailable witness that was given at the preliminary hearing held in the case. In rejecting the admissibility of that testimony, the supreme court noted that a preliminary hearing merely requires the People to show probable cause that the charged offense has been committed and that a criminal defendant often has strategic reasons not to fully cross-examine a witness in that context.

¶ 50 As the supreme court noted, "A preliminary hearing is limited to matters necessary to a determination of probable cause. The rights of the defendant are therefore curtailed: evidentiary and procedural rules are relaxed, and the rights to cross-examine

20

witnesses and to introduce evidence are limited to the question of probable cause." *Id.* at 977 (citations omitted). Thus, the court concluded that the preliminary hearing testimony was not admissible because the defendant lacked an adequate incentive and opportunity to fully and robustly cross-examine the witness during the preliminary hearing. *Id.* (At a preliminary hearing, the court "may not engage in credibility determinations unless the testimony is incredible as a matter of law.").

¶ 51    In contrast, Paul's testimony was given at a civil trial on the merits. As discussed more fully *infra* Part II.B.3.b, Harmon had both a strong motive and ample opportunity to fully examine Paul at the civil trial. Thus, to the extent *Fry* permits the conclusion that the Colorado confrontation clause requires a qualitative analysis of the defendant's opportunity for cross-examination, we conclude that the condition was satisfied in this case.

¶ 52    Moreover, in opinions subsequent to *Fry*, the Colorado Supreme Court has made clear that the requirements of Colorado's confrontation clause are not materially different from *Crawford*'s test. *See Nicholls v. People*, 2017 CO 71, ¶ 31. There the court stated:

> [W]e have long interpreted Colorado's
> Confrontation Clause as commensurate with
> the federal Confrontation Clause.  *See, e.g.,*
> *Compan[ v. People],* 121 P.3d [876,] 885-86
> [(Colo. 2005)] (rejecting the petitioner's
> argument that the state Confrontation Clause
> protects broader rights than the federal
> Confrontation Clause); *Blecha[ v. People],* 962
> P.2d [931,] 941 [(Colo. 1998)] (explaining that
> *Dement* adopted the *Roberts* test[6] "[i]n an
> effort to maintain consistency between
> Colorado law and federal law"); *[People v.]*
> *Dement,* 661 P.2d [675,] 680-81 [(Colo. 1983)].
> Our holding today maintains the consistency
> between state and federal law on this issue.

¶ 53    The supreme court's decisions in instances in which the prosecution sought to introduce prior testimony from a criminal suppression hearing or a prior criminal trial bear this out.  In these circumstances, the supreme court has reasoned that prior testimony is admissible if the defendant had a meaningful opportunity to cross-examine the unavailable witness about the pertinent testimony.  *See, e.g., People v. Madonna,* 651 P.2d 378, 385 n.8 (Colo. 1982) (finding the requirements of CRE 804(b)(1) were satisfied when the deceased witness was questioned about the relevant events in an earlier suppression hearing in the same case).

---

6 The *Roberts* test comes from *Ohio v. Roberts,* 448 U.S. 56 (1980).

¶ 54     For these reasons, we conclude that the trial court did not

violate Harmon's confrontation rights under either the United

States or Colorado Constitutions.

b.     Admissibility Under CRE 804(b)(1)

¶ 55     In addition to his arguments under the Confrontation Clauses,

Harmon contends that the trial court erred by admitting Paul's

prior testimony under Rule 804(b)(1), which provides as follows:

> The following are not excluded by the hearsay
> rule if the declarant is unavailable as a
> witness:
>
> (1) *Former Testimony.*  Testimony given as a
> witness at another hearing of the same or a
> different proceeding, or in a deposition taken
> in compliance with law in the course of the
> same or another proceeding, if the party
> against whom the testimony is now offered, or,
> in a civil action or proceeding, a predecessor in
> interest, had an opportunity and similar
> motive to develop the testimony by direct,
> cross, or redirect examination.

CRE 804(b)(1).

¶ 56     Unlike some of the uncertainties associated with Colorado's

confrontation clause jurisprudence, Rule 804(b)(1) unequivocally

requires the court to make a qualitative analysis of the prior

opportunity to examine an unavailable declarant.  Thus, the

controlling inquiry is whether Harmon's counsel in the civil trial

23

had "an opportunity and similar motive to develop [Paul's] testimony by direct, cross, or redirect examination." *Id.*

¶ 57     Harmon notes that no criminal charges had been filed before the civil trial and that the issues in the civil trial were fundamentally different than those presented in the criminal case. Thus, Harmon argues, his counsel had little motive to fully cross-examine Paul — particularly with respect to the issues most relevant to the criminal charges — and the trial court erred by finding that "the same issues were addressed in the prior proceeding."

¶ 58     The People counter that the criminal court properly admitted Paul's testimony because Harmon's counsel in the civil trial had substantial motivation to fully examine Paul about the threat.

¶ 59     As previously noted, the criminal court thoroughly analyzed these arguments and concluded that Harmon's counsel in the civil trial "not only had the motive to cross-examine [Paul] as to [the threat], but he actually did so." Indeed, the criminal court found that both Harmon's and Hershberger's counsel spent considerable time examining Paul about the threat and arguing about its meaning and impact. As the criminal court observed, "The reason

for that focus was simple — the threat itself and [Paul and Anna's] reaction to it were central issues in the civil action." These findings are supported by the record.

¶ 60 In the face of these findings, Harmon relies on the legal distinctions between a civil case and a criminal case. Harmon emphasizes the differences between the "preponderance of the evidence" civil burden of proof and the criminal "beyond a reasonable doubt" standard. He also points to differences in the consequences: monetary or related remedial relief in the civil context versus potential incarceration in the criminal context. While not expressly urging us to adopt a per se rule, Harmon seems to be suggesting that we should hold that testimony from a prior civil case can never be admitted in a criminal case under Rule 804(b)(1). But Harmon cites no authority, and we are aware of none, adopting such a broad rule.

¶ 61 In Harmon's defense, and as both parties concede, no reported Colorado case has addressed whether prior civil testimony can be used at a subsequent criminal case. But we are persuaded that prior civil trial testimony may — in appropriate circumstances — be admitted in a criminal case under Rule 804(b)(1).

¶ 62    In reaching this conclusion, we rely on principles established by the supreme court concerning when prior testimony provided in a criminal case may be used in a subsequent criminal trial. As previously noted, the supreme court has held that prior testimony from a preliminary hearing is not admissible in the subsequent criminal trial. *Fry*, 92 P.3d at 977-78. This rule flows from the limited opportunity or motive for robust cross-examination and the relaxation of procedural and evidentiary rules at a preliminary hearing versus a criminal trial. *Id.*

¶ 63    In contrast to *Fry*'s outcome, the supreme court held in *Madonna* that a deceased declarant's prior testimony at a suppression hearing was admissible at the subsequent criminal trial. 651 P.2d at 385 n.8. The court reasoned that the rationale for

> precluding preliminary hearing testimony to be introduced at trial if the witness is unavailable[] is based upon the limited purposes of a preliminary hearing as a screening device for unwarranted charges. Considering the broader purpose of suppression hearings which involve questions of credibility and fact-finding, we see no reason to extend [that] rationale . . . to this factual setting. This is especially true where, as here, the witness was extensively cross-examined at

> the suppression hearing on the very matters for which the evidence is offered at trial. *See also* CRE 804(b)(1) . . . , which would also allow admission of this testimony.

*Id.*

¶ 64 Synthesizing these cases, the supreme court has counseled that Rule 804(b)(1) permits the use of prior sworn testimony when there are sufficient opportunities and motivation to fully develop the prior testimony that is being offered at the criminal trial. Thus, the focus should not be solely on the type of case in which the proffered testimony was provided, but rather on whether, during the prior proceeding, the opponent of the testimony had a full, fair, and motivated opportunity to examine the unavailable declarant about the material aspects of the proffered testimony.

¶ 65 As the Second Circuit Court of Appeals has observed,

> The proper approach, therefore, in assessing similarity of motive under [Fed. R. Evid.] 804(b)(1) must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue. The nature of the two proceedings — both what is at stake and the applicable burden of proof — and, to a lesser extent, the cross-examination at the prior proceeding — both what was undertaken

> and what was available but forgone — will be relevant though not conclusive on the ultimate issue of similarity of motive.

*United States v. DiNapoli*, 8 F.3d 909, 914-15 (2d Cir. 1993) (applying FRE 804(b)(1) and excluding use of grand jury testimony in a later criminal trial); *see Galindo v. Valley View Ass'n*, 2017 COA 78, ¶ 11 n.6 ("We consider persuasive case law applying the federal counterpart to [a Colorado rule] because the federal rule and the state rule are virtually identical."). Numerous federal courts have applied similar principles while upholding the admission of prior civil testimony in a subsequent criminal trial. *See, e.g.*, *United States v. Vartanian*, 245 F.3d 609, 613-14 (6th Cir. 2001) (applying Fed. R. Evid. 804(b)(1) and concluding decedent witness's testimony in prior civil action was admissible in defendant's criminal trial); *United States v. McClellan*, 868 F.2d 210, 214-15 (7th Cir. 1989) (same).

¶ 66 In applying *DiNapoli,* the Eighth Circuit recently identified various factors that a court may consider in evaluating the similar motive factor in Fed. R. Evid. 804(b)(1):

> The question of similarity is inherently factual, and thus not conducive to general rules. A court may consider, among other factors, the

purpose of the prior proceeding; the nature of the prior proceeding; any differences in the burdens of proof; the information known to the examining party at the time of the prior testimony; the motive of the examining party to avoid disclosing such information; the scope of examination undertaken and forgone, and whether the prior testimony contradicts the evidence introduced at trial.

*United States v. Euring*, 112 F.4th 545, 552-53 (8th Cir. 2024) (citations omitted). We agree that these factors provide a useful analytical framework for assessing the "opportunity and similar motive" issues under CRE 804(b)(1). But we also emphasize that the factors are not exclusive and, most importantly, that they must be applied in a manner that does not lose sight of the central and controlling inquiry: whether the opponent of the testimony had a full, fair, and motivated opportunity to examine the unavailable declarant about the material aspects of the proffered testimony.

¶ 67 The criminal court did not have the benefit of the *Euring* decision when it ruled on the admissibility of Paul's civil testimony. But the court intuitively relied on many of the factors identified in *Euring*, such as the nature and purpose of the prior proceeding, the scope of Paul's examination by Harmon's counsel, the importance of the testimony to the outcome of the civil proceeding, and the

29

corresponding motivation that Harmon's counsel had to fully explore Paul's testimony concerning the 2015 death threat. Indeed, the court found that the threat itself was a central issue at the civil trial and therefore concluded that "Harmon's civil trial lawyer had the same motive to cross-examine [Paul] in the [civil] dispute as his criminal attorney would have had in the case with respect to the areas that the People have endorsed."

¶ 68 Moreover, Harmon does not dispute that he threatened to shoot Paul. Nor does Harmon dispute that his threat was based on Paul's alleged breach of the very contract at issue in the civil litigation. And he does not dispute that, after the civil court entered its divided judgment, he remained so upset that he began to repeatedly follow Paul and Anna, culminating with him parking in their driveway while possessing two guns, one of which was deceptively hidden inside a six-pack container. Given Harmon's actions before and during the civil trial, it begs credulity to suggest that his counsel was not substantially motivated to fully plumb Paul's testimony about the 2015 death threat.

¶ 69 For these reasons, we conclude that the criminal court did not err by admitting Paul's civil testimony.

## c. Transcript Versus FTR Recording

¶ 70    Next, Harmon contends that the criminal court erred by declining his request to introduce the FTR recording of Paul's testimony at the civil trial, rather than the court reporter's official transcript.  We are not persuaded.

¶ 71    Harmon begins by suggesting that the trial court should have allowed the jury to hear the FTR recording of Paul's testimony because the recording was the "best evidence" of the testimony and would have aided the jury's assessment of Paul's demeanor and credibility.  *See* CRE 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required," subject to exceptions not applicable here.).  But Harmon also acknowledges that the supreme court has held, in analogous circumstances, that both a transcript and a recording of the same event are originals entitled to equal dignity.  *See Banks v. People*, 696 P.2d 293, 297-98 (Colo. 1985) (analyzing a transcript and recording of a statement made to law enforcement).

¶ 72    Thus, Harmon is left to argue that the trial court abused its discretion by not introducing the FTR recordings because the

recordings better replicated the circumstances of Harmon's live testimony. We disagree.

¶ 73     The official record of trial court proceedings is the certified transcript. "Copies of electronic recordings of proceedings shall not be used as the official record for purposes of appeal, motions or other court proceedings. Only certified transcripts by reporters or authorized transcribers pursuant to this [Chief Justice Directive] shall be used as the official records of court proceedings." Chief Justice Directive 05-03, Management Plan for Court Reporting and Recording Services, p. 7 (amended July 2023).

¶ 74     This directive is based on numerous practical considerations. The FTR system was designed for the convenience of the courts, not as a means of creating an official audio record of trial court proceedings. Moreover, while usually reliable, FTR recordings are not foolproof given the limitations of technology; human differences in terms of enunciation, projection, and use of microphones; and occasional operational errors in starting the FTR system.

¶ 75     Moreover, we are not persuaded by Harmon's argument that an FTR recording necessarily allows a fact finder to better assess a witness's credibility than does a transcript. It is true that an audio

recording may permit the fact finder to hear the speaker's tone of voice, but when heard in isolation from facial and body expressions, tone of voice can create a misleading rather than informative impression.

¶ 76     In any event, Harmon cites no legal authority permitting, much less requiring, the use of FTR recordings in lieu of the certified record.  In the absence of such authority, we cannot conclude that the criminal court abused its discretion by admitting the official transcript of Paul's testimony rather than the FTR recordings.

## C.     The Trial Court's Failure to Recuse

¶ 77     Harmon contends that Judge Schultz reversibly erred by failing to recuse himself from the criminal case.  We disagree.

### 1.     Additional Facts

¶ 78     Upon learning that Judge Schultz was presiding over the criminal case, the prosecution filed a notice that defense counsel later joined, requesting that Judge Schultz consider whether recusal was appropriate because he had presided over the civil case and the same conduct would be at issue in the criminal case.

¶ 79    Judge Schultz entered a written order declining to recuse himself. In the order, he reasoned,

> Ultimately, the only allegation in the People's submission supporting their request for disqualification is the claim that "the conduct and actions in [the civil] case is likely to be extensively discussed in testimony in the case at bar." . . .

> The Court has no idea what that statement means or how such testimony would warrant recusal in this case. Given the lack of any legal authority or factual explanation for the request, the People's notice regarding recusal is DENIED without prejudice.

¶ 80    At a subsequent bond hearing, without first filing a motion for recusal, defense counsel requested a hearing to address the recusal issue. Judge Schultz did not set a hearing at that time but noted that if there was a basis for recusal beyond what was raised in the People's earlier notice, counsel could file a motion and supporting affidavits.

¶ 81    Judge Schultz then denied the oral request in a written order and directed any party seeking recusal "to file a written motion supported by factual affidavits as required by the governing rules and law" and stated that if the court "receives that filing, it will determine if an evidentiary hearing is warranted." No party filed a

34

recusal motion or supporting affidavits, and the case proceeded to trial.

### 2. Standard of Review and Applicable Law

¶ 82    We review de novo whether a trial court judge's recusal was required. *People v. Garcia,* 2024 CO 41M, ¶ 20. The Fourteenth Amendment's Due Process Clause mandates recusal when the objective "*probability* of actual bias . . . is too high to be constitutionally tolerable." *Sanders v. People*, 2024 CO 33, ¶ 29 (quoting *Rippo v. Baker,* 580 U.S. 285, 287 (2017)); *see also* § 16-6-201(1)(b), (c), C.R.S. 2024 (a judge will be disqualified to hear a case if the charged offense is alleged to have been committed against the judge's person or property or they are in any way prejudiced with respect to the case, parties, or counsel).

¶ 83    In a criminal matter, a party seeking the substitution of a judge must file a verified motion within fourteen days of the case's assignment, together with supporting affidavits of at least two credible individuals who are not related to the defendant. Crim. P. 21(b)(1). Any judge who is aware of a circumstance in which they would be disqualified shall, on their own motion, disqualify themselves. *Id.*

¶ 84    A party seeking disqualification must allege concrete facts; "conclusory statements, conjecture, and innuendo do not suffice." *Black v. Black*, 2020 COA 64M, ¶ 117 (quoting *Zoline v. Telluride Lodge Ass'n*, 732 P.2d 635, 639 (Colo. 1987)). "Disqualification for an appearance of impropriety must be distinguished from disqualification for actual bias. While the former may be waived, the latter may not." *Rea v. Corr. Corp. of Am.*, 2012 COA 11, ¶ 22 (citing *People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011)); *see also Garcia*, ¶ 27 ("[T]his court has recognized that 'litigants may waive disqualification when the disqualification is not for reasons of actual bias or prejudice.'" (quoting *A.G.*, 262 P.3d at 650)).

### 3.    Application

¶ 85    Harmon contends that Judge Schultz reversibly erred by failing to recuse himself because he was actually biased against Harmon, or, at a minimum, the appearance of bias was great enough that recusal was necessary.

¶ 86    The actual bias, Harmon continues, is that Judge Schultz may have witnessed some of the criminal conduct the prosecution alleged and that the judge generated some of Paul's testimony by

asking him follow-up questions. Therefore, Harmon argues, Judge Schultz functionally operated as an "advocate who generated evidence relied upon by the prosecution," and therefore he was required to recuse.

¶ 87    Harmon also argues that Judge Schultz *may* have been present during the 2018 incident Anna described in which Harmon commented to a courthouse deputy that he may return after lunch in handcuffs. If Judge Schultz was privy to the comment that Harmon made to the deputy, Harmon argues, he could have been a material witness at the criminal trial.

¶ 88    Finally, Harmon argued that, because Judge Schultz made factual findings and issued the order in the civil case requiring Harmon to remove the building from the Hershberger's property, the jury may have given his findings in the civil case undue weight.

¶ 89    The People respond that Harmon waived any recusal argument by failing to comply with the requirements of Crim. P. 21(b), and that even if Harmon had filed a procedurally compliant motion, it would have failed on the merits. We agree that Harmon waived any appearance of impropriety argument, and that his argument asserting that Judge Schultz had an actual bias fails on the merits.

¶ 90    As noted, a party waives the right to assert an appearance of bias if they do not raise the issue in the trial court.  *Garcia*, ¶ 27; *Rea*, ¶ 22.  Harmon failed to file a motion or other pleading asserting that Judge Schultz's presiding over this case created an appearance of bias.  Thus, Harmon waived his right to make any appearance of bias argument on appeal, and we do not address it further.

¶ 91    In contrast, Harmon's claim of actual bias cannot be waived, so we address the merits of the contention.

¶ 92    We perceive nothing to support Harmon's contention that Judge Schultz was actually biased against him.  Despite multiple opportunities to file a motion for recusal, Harmon failed to do so.  Thus, we lack specific facts to indicate that Judge Schultz was actually biased.  Moreover, the objective facts do not warrant such a conclusion.

¶ 93    Prior involvement in a case does not automatically require a judge to recuse themselves.  *People in Interest of S.G.*, 91 P.3d 443, 447 (Colo. App. 2004).  Nor does the record suggest that Judge Schultz had a bent of mind that prevented him from treating Harmon fairly in the criminal trial.  *Brewster v. Dist. Ct.*, 811 P.2d

812, 813-14 (Colo. 1991) ("Recusal is intended to prevent a party from being forced to litigate before a judge with a bent of mind."). Thus, we perceive no factual basis to support Harmon's conclusory appellate assertion that Judge Schultz was actually biased against him. *See Sanders*, ¶ 50 ("Only when a judge was actually biased will we question the reliability of the proceeding's result. In other words, while both an appearance of impropriety and actual bias are grounds for *recusal* from a case, only when the judge was actually biased will we question the *result*." (quoting *People in Interest of A.P.*, 2022 CO 24, ¶ 29)).

¶ 94     Given the absence of apparent bias, we discern no error in Judge Schultz's decision not to recuse himself from this case.

### D.     Lesser Nonincluded Instruction

¶ 95     Finally, Harmon contends that the trial court erred by refusing his counsel's request that the court instruct the jury on harassment, a lesser nonincluded offense to the stalking charges. We discern no error.

### 1.     Standard of Review and Applicable Law

¶ 96     A trial court must accurately instruct the jury concerning the controlling law. *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011).

We review a trial court's jury instructions, as a whole, de novo to determine whether the court met this obligation. *Id.* If the trial court's instructions accurately describe the applicable law, we generally review the court's decision whether to give a particular instruction for an abuse of discretion. *People v. Paglione*, 2014 COA 54, ¶ 45. A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Vigil*, 2024 COA 72, ¶ 19.

¶ 97 A lesser nonincluded offense is an offense that is subject to less severe punishment than, and that contains at least one element that is not part of, the charged offense. *People v. Naranjo*, 2017 CO 87, ¶ 15. "[A] criminal defendant is entitled to have the jury presented with the option to convict him of a lesser non-included offense, so long as a rational evidentiary basis exists to simultaneously acquit him of the charged offense and convict him of the lesser offense." *Id.*

¶ 98 Harassment is a lesser nonincluded offense of stalking. *Pellegrin v. People*, 2023 CO 37, ¶¶ 36-47. To support a guilty verdict on a harassment charge, the prosecution must prove beyond a reasonable doubt that the defendant acted "*with intent* to harass,

annoy, or alarm another person" and "[f]ollow[ed] a person in or about a public place." § 18-9-111(1)(c), C.R.S. 2024 (emphasis added).

## 2.    Application

¶ 99     Harmon contends that there was sufficient evidence to support an instruction on harassment, rather than stalking, because he admitted that he followed Paul and Anna to church — a public location — purportedly to learn more about their faith. Harmon specifically testified in the criminal trial that he "wasn't trying to scare them or anything" and "I didn't get up on their bumper . . . I didn't want to bother them."

¶ 100    Harmon is correct that the act of following Paul and Anna to church satisfies the first element of a harassment charge. Harmon also testified, however, that he had no desire to scare them and actively tried to stay out of their view. This explanation was consistent with Harmon's purported desire to obtain more information about their beliefs. But it is inconsistent with the mental state element of harassment, which requires proof that Harmon's actions were made "with intent to harass, annoy, or alarm another person." § 18-9-111(1).

41

¶ 101    Contrary to Harmon's argument on appeal, we see no rational basis by which the jury could have concluded that he followed Paul and Anna to church, while trying to remain unseen, solely in an effort to determine their faith, but that he took such action with an intent to harass, annoy, or alarm them.

¶ 102    Therefore, even if the jury believed Harmon's purported explanation for why he followed Paul and Anna to church, there was no rational basis for the jury to convict him of harassment. *See Naranjo*, ¶ 19 ("[A] defendant is not entitled to an instruction on a lesser non-included offense that contradicts the defendant's sworn testimony at trial."). Accordingly, the trial court did not err by declining to instruct the jury on the lesser nonincluded offense of harassment.

### III.    Disposition

¶ 103    The judgment is affirmed.

JUDGE WELLING and JUDGE KUHN concur.